## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELIZABETH LUPACCHINO, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 3:02 CV 2281 (MRK) |
| | : | |
| v. | : | |
| | : | |
| ADP, INC. a/k/a AUTOMATIC DATA | : | |
| PROCESSING, INC. | : | |
| | : | |
| Defendant. | : | June 4, 2004 |

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, ADP, Inc. ("ADP" or the "Company"), hereby respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment dismissing the Complaint of Elizabeth Lupacchino ("Plaintiff"), in its entirety.

## I.    PRELIMINARY STATEMENT

Plaintiff was employed by ADP as a District Manager in its Windsor, Connecticut facility from June of 1999, until she was deemed to have resigned in March of 2002.  The Complaint contains six counts; Counts One and Four set forth claims of hostile work environment in violation of the Connecticut Fair Employment Practices Act, C.G.S. §§ 46a-60 (the "CFEPA"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.  §§ 2000e et seq. ("Title VII"), respectively; Counts Two and Five state claims of retaliation in violation of both federal and state law; and Counts Three and Six state separate causes of action for constructive discharge.

## II.    STATEMENT OF FACTS

Plaintiff was hired by ADP as a District Manager/Salesperson in or about June of 1999.  Her job responsibilities primarily included selling payroll and tax preparation services to

businesses in the area.  (Complaint ¶ 4)  Plaintiff initially reported to Kenneth Kitzmiller, the Area

Sales Executive. (Plaintiff's Depo. p. 111; Kitzmiller Depo., p. 33) William Gay was hired by

Kitzmiller in or about November of 2001 as a District Sales Manager to oversee the Windsor,

Connecticut office where Plaintiff was working.  (Kitzmiller Depo. pp. 85-86; Gay Depo. pp. 18-22;

Carr Depo. p. 127)  Gay thereafter reported directly to Kitzmiller.  (Gay Depo. pp. 56-57; Carr

Depo., pp. 125-26)  Plaintiff began reporting to Gay promptly upon his hire.  (Complaint ¶ 7, Ex. A

hereto)

### Plaintiff's Complaints to Human Resources

Plaintiff claims that soon after she began reporting to Gay, on or about November 26,

2001, Gay approached her from behind and grabbed her arm; while doing so, he brushed his hand

against her breast.  (Complaint ¶ 8; Plaintiff's Depo. pp. 61-63)  That same afternoon, Plaintiff went

to Human Resources ("HR") and spoke with Kathy Alexander.  (Complaint ¶ 9; Plaintiff's Depo. pp.

62-63)  Alexander explained that Plaintiff was not in the division for which she had HR

responsibility, and thus, she should expect follow-up from the appropriate person, Debbie Dank,

Area Human Resources Director.  (Plaintiff's Depo. pp. 74-75)  She also told Plaintiff to inform her

if there were any interim problems with Gay.  (Plaintiff's Depo. pp. 63-64)

Plaintiff claims that the following day, November 27, she was in attendance at a sales

meeting during which Gay repeatedly used the words "fuck" and "fucking" (as adjectives).

(Complaint, ¶ 10; Plaintiff's Depo. p. 65)   Plaintiff conceded that Gay's use of these words was not

"sexual". (Plaintiff's Depo. p. 65)  Moreover, Plaintiff has never claimed this language was directed

at her due to gender.  In that regard, undisputed testimony was proffered that Gay's profanity was

directed at males and females alike in the department.  (Kehl Depo. pp. 32-33, 36; Kitzmiller Depo.

pp. 6-7, 103; Gay Depo. p. 43, 95, 117; Carr Depo. pp. 147-48)  Further noteworthy, undisputed

testimony confirmed that many members of the department, both males and females at all levels,

occasionally used profanity. (Kehl Depo. pp. 32-33; Kitzmiller Depo. pp. 6-7, 103; Gay Depo. pp. 43, 117; Carr Depo. pp. 147-48) Plaintiff was offended by Gay's language, and consequently, she returned to Alexander and complained. (Complaint ¶ 11; Plaintiff's Depo. pp. 66-67)

As Plaintiff was leaving the office on the evening of that same day, November 27, she claims Gay grabbed the lapels of her coat, shook her, and stated, in an intimidating tone of voice, "what was your day like?" (Complaint ¶ 12; Plaintiff's Depo. pp. 69-70) Plaintiff testified that this conduct did not constitute a sexual advance. (Plaintiff's Depo. p. 70) Plaintiff complained again to Alexander. (Complaint ¶ 13; Plaintiff's Depo. pp. 71-72) In the interim, Alexander telephoned Dank and informed her that she had received complaints from Plaintiff regarding Gay. (Dank Depo. pp. 8-10) By the morning of November 29, Dank and Plaintiff had begun to trade telephone calls regarding Plaintiff's complaints to Alexander. (Plaintiff's Depo. p. 76; Dank Depo. pp. 92-93) Beginning November 30, Plaintiff decided to take a week off from work, and thus, she did not return until Monday, December 10. (Plaintiff's Depo. pp. 77, 82, 90-91) However, during the week Plaintiff was absent, she and Dank spoke. (Plaintiff's Depo. pp. 74-76; Carr Depo. pp. 149-50) Plaintiff reiterated her allegations, and was asked by Dank whether she would like her reporting structure to change. Plaintiff responded that she "wanted to think about it". (Dank Depo. pp. 60-61) Plaintiff admits that between November 29 and December 10, she had no interaction with Gay whatsoever. (Plaintiff's Depo. pp. 76, 91; Gay Depo. pp. 122-24) Dank promptly informed Gay's superior, Kitzmiller, of Plaintiff's complaints. (Kitzmiller Depo. pp. 5-6)

Dank and Kitzmiller agreed that Kitzmiller would immediately speak to Gay about the complaints. During this conversation with Gay, Gay admitted he may have touched Plaintiff's lapel, that he was frustrated with her constantly leaving early from the office, but that he did not engage in any intimidating or inappropriate behavior. Gay admitted to the use of profanity. (Gay Depo. pp. 41-43, 45-49, 53; Kitzmiller Depo. pp. 6-8, 10; Plaintiff's Depo. pp. 104-05) Nevertheless,

Kitzmiller counseled Gay about the use of profanity, not just in connection with Plaintiff, but in general as constituting poor and unacceptable management style.  He further cautioned Gay about any "touching" of employees. (Kitzmiller Depo. pp. 4-5, 10, 13; Gay Depo. p. 53; Carr Depo. pp. 65-66)  Kitzmiller emphasized that unwanted touching of any type was not acceptable at ADP. (Kitzmiller Depo. pp. 13, 101-02)  Finally, he told Gay that he was going to transfer reporting responsibility for Plaintiff from Gay to himself.  (Kitzmiller Depo. p. 16)  Kitzmiller did not ask Gay whether he intentionally (or unintentionally) touched Plaintiff's breast during one of the "touching" incidents.  (Kitzmiller Depo. p. 8)

On December 11, the day after she returned from her week off, Plaintiff met with Dank and Kitzmiller.  (Complaint ¶¶ 18-19; Plaintiff's Depo. pp. 93-94; Carr Depo. pp. 149-51)  At this meeting, Kitzmiller told Plaintiff that he had already spoken to Gay about the issues she had raised.  (Kitzmiller Depo. pp. 22, 102; Carr Depo. p. 70)  Kitzmiller also told Plaintiff that he wanted her to feel comfortable working at ADP.  (Plaintiff's Depo. p. 95; Dank Depo. p. 66; Kitzmiller Depo. pp. 21-22)  Accordingly, he told Plaintiff that, effective immediately, she would be reporting to him, rather than to Gay.[1]  (Complaint ¶ 19; Plaintiff's Depo. pp. 90-91; Dank Depo. pp. 73-74; Kitzmiller Depo. pp. 22-23)  Plaintiff appeared to be satisfied with this resolution.  (Dank Depo. pp. 66-67; Kitzmiller Depo. p. 23; Carr Depo. p. 152)  Dank discussed the situation and the outcome with her superior, Mac Carr, the HR Area Director.  Carr agreed that the verbal counseling/warning was the appropriate course of action.  (Dank Depo. pp. 54-57; Carr Depo. pp. 46-47, 49, 63-66)

Thus, as of December 11, Plaintiff never again reported to Gay.  (Plaintiff's Depo. pp. 108-09, 129, 133)  As previously mentioned, between the date of her initial complaint, November 26, and December 11, Plaintiff did not interact with Gay because she was absent.  Furthermore, after December 11, she admittedly had very limited interaction with him.  Specifically, on a few

---

[1] Eventually, Plaintiff began reporting to Scott Martin instead of Kitzmiller. (Martin Depo. pp. 12-14)

occasions, Gay asked Plaintiff for her sales numbers.  (Plaintiff's Depo. pp. 109-10)  Plaintiff also saw Gay at the office Christmas party.  (Plaintiff's Depo. pp. 109-10)  Thus, Plaintiff cannot point to any direct "harassment" between the date of her complaint and her ultimate departure from ADP.

Kitzmiller was aware that the use of profanity was rampant in the entire department. Thus, he held a meeting of department managers, and cautioned that the use of profanity was unprofessional and would not be permitted.  (Kitzmiller Depo. pp. 54-55, 102-03; Kehl Depo. pp. 33-34; Gay Depo. pp. 53-54)  Plaintiff cannot contradict defense witness testimony that Gay was verbally counseled and admonished, nor that a management meeting was held concerning the use of profanity in general.

### Allegations of Conduct After December 11 Toward Co-Workers

Plaintiff further alleges that in January of 2002, Gay came up behind one of her co-workers and said, "it's a good thing that you have a cup of coffee in your hand because I was just getting ready to grab you."  (Plaintiff's Depo. p. 47)  Gay also allegedly came from behind another co-worker, swung her around, and gave her a bear hug.  (Plaintiff's Depo. p. 48.)  Finally, Plaintiff claims that she witnessed Gay giving a back rub to another co-worker.  (Plaintiff's Depo. p. 110) Plaintiff never complained to HR or to any member of management about these three, alleged events. (Plaintiff's Depo. p. 48; Kitzmiller Depo. p. 56)  Again, Plaintiff never alleged she was harassed after the date of her HR complaint.

### Alleged Retaliation

Plaintiff claims that after her complaint about Gay, her co-workers were "sarcastic" toward her and "ostracized" her.  (Plaintiff's Depo. p. 85)  Yet, Plaintiff failed to offer any factual basis for her belief that such conduct, even if true, was attributable to her complaint; indeed, she could not even prove these co-workers had knowledge of the fact or nature of her complaints. (Plaintiff's Depo. pp. 85-88)  Plaintiff further alleges that ADP failed to provide support for her sales

calls.  (Complaint ¶ 22; Plaintiff's Depo. p. 114)  Specifically, she claims that Rose Kitzmiller, Ken Kitzmiller's wife, was scheduled to accompany her on sales calls, but would cancel "at the last minute".  (Plaintiff's Depo. pp. 114-20)  Once again, Plaintiff admitted she had no factual support for her presumption that any cancellations were based on her internal complaints—she just "had feelings".  (Plaintiff's Depo. p. 120)[2]  Additionally, Plaintiff claims that ADP management failed to include her in weekly sales meetings because she did not have a "manager".  (Plaintiff's Depo. p. 127)  However, it is undisputed that Plaintiff was, in fact, reporting to Kitzmiller during this time and never complained about being excluded from such meetings, or about having trouble obtaining support for sales calls.  (Plaintiff's Depo. pp. 127, 146; Kitzmiller Depo. pp. 59, 104-05)

Plaintiff also alleges that her territory was reduced; (Plaintiff's Depo. p. 130) however, it is undisputed that this territory was reduced in July of 2001, well before Plaintiff complained.  (Plaintiff's Depo. p. 130)  Critically important, it is similarly undisputed that Plaintiff was not disciplined in any manner, nor did she receive any counseling or warnings of any type after she complained.  (Plaintiff's Depo. p. 112)  Plaintiff conceded further that she never complained to HR about a perception of retaliation.  (Carr Depo. pp. 98, 151-52; Plaintiff's Depo. p. 49)

Finally, Plaintiff alleges that ADP's request that she provide certification of her need for leave, and its ultimate determination that she had resigned when she failed to satisfy that requirement, was retaliatory in nature.  (Plaintiff's Depo. p. 143)  However, critical to note, Plaintiff admitted this certification requirement was standard, and that it applied to all employees seeking leave. (Plaintiff's Depo.  pp. 145-46)  Thus, she failed to proffer any evidence whatsoever to support her disingenuous allegations.

---

[2] It is undisputed that Kitzmiller told Plaintiff that Dave Pinette would assist her in the field.  (Kitzmiller Depo. p.53; Ex. I)  Yet, Plaintiff never once solicited Pinette's assistance (Kitzmiller Depo p. 54), nor complained to Kitzmiller that she was having trouble getting support for her field calls.  (Kitzmiller Depo. p. 104)

## **Job Abandonment**

On or about February 14, Plaintiff failed to show up at work.  She left a voicemail for her manager, Scott Martin, informing him that she was unable to come to work and that she would be faxing him a doctor's note substantiating her illness and need for leave.  Nevertheless, Plaintiff neither provided this note, nor did she come to work.  (Carr Depo. pp. 113-14, 154)

Consequently, pursuant to the terms of ADP's standard leave policy, which Plaintiff admittedly received, (Ex. J; Plaintiff's Depo. pp. 145-46, 157-58; Carr Depo. p. 114), on or about February 22, Carr wrote Plaintiff a letter reminding her that she needed to provide ADP with the proper medical certification.  He gave Plaintiff approximately two weeks, until March 11, to comply with this requirement.  (Ex. K; Carr Depo. pp. 113-14)  In this letter, as well as in all letters sent to employees on leave, Carr also stated that failure to submit the forms and the doctor's note by March 11 would be considered a voluntary resignation.  (Ex. K; Plaintiff's Depo. p. 8; Carr Depo. p. 113)

Plaintiff did not directly respond, but on February 28, 2002, ADP received a doctor's note on her behalf, back-dated to February 14, stating simply that she could not work due to a "medical condition".  (Plaintiff's Depo. p.18; Ex. L; Carr Depo. pp. 119-20)  During her deposition, Plaintiff claimed that this "medical condition" consisted of "extreme stress, anxiety, and panic attacks."  (Plaintiff's Depo. p. 25)  However, Plaintiff still did not return the required leave of absence forms.  (Plaintiff's Depo. pp. 8, 145-46)

Nevertheless, ADP did not terminate her employment; rather, on March 19, after not receiving forms for another nearly three weeks, Carr sent Plaintiff yet another letter reminding her that she needed to complete these forms, and provided an additional ten days, until March 29, to do so.  He again reminded Plaintiff that, consistent with ADP's express policy, failure to meet this deadline would be considered a voluntary resignation.  (Ex. M)

Plaintiff never returned completed forms; never sent any additional doctor certification; never returned to work; and never notified ADP that she was <u>not</u> coming back to work. (Plaintiff's Depo. p. 21; Carr Depo. p. 144)  The reason for this surprising behavior became clear—while ADP was under the impression she was unable to work, and continued her salary and benefits on that assumption, Plaintiff had already increased her hours to full time for another employer, HealthWorks.  Plaintiff knew the salary and benefit continuation was effectuated expressly because ADP believed she was on an FMLA qualified leave, a myth she perpetuated when she left, and continued to perpetuate by having a doctor send a note on February 28 stating she was "unable to work".[3]  (Plaintiff's Depo. pp. 32, 180; Ex. J; Ex. L)  Also at the same time, Plaintiff told her treating psychologist by early February of 2002 that she did not intend to ever return to ADP, even though she was still accepting salary and benefits from the Company.  (Conter Depo. pp. 56-58)  Indeed, ADP continued to pay Plaintiff her full salary and benefits through March 29, 2002.  (Plaintiff's Depo. pp. 18, 43)  After receiving no response from Plaintiff despite several opportunities to do so, ADP determined that Plaintiff had abandoned her job.  Accordingly, on April 3, 2002, Carr wrote Plaintiff a final letter, consistent with ADP's written job abandonment policy, informing her that she was deemed to have resigned effective March 29.  (Ex. O)

Plaintiff continued, and continues to this day, to be employed by HealthWorks.  She stopped being treated by any mental health professional in February of 2002, shortly after she began working for Healthworks on a full time basis.  (Plaintiff's Depo. pp. 27-29)

---

[3] ADP's Leave of Absence Policy states that, "[a]s a condition of continued employment with ADP during a leave of absence, the associate granted a leave of absence agrees not to seek or obtain gainful employment elsewhere . . . if the associate does not meet these conditions, he/she will be considered to have voluntarily resigned his/her position. (Ex. J)

**Gay's Employment is Terminated**

After Plaintiff began her leave of absence, a second employee made an internal complaint against Gay.  On or about March 4, 2002, Gay's employment was terminated incident to the investigation of this second complaint (specifically, he was permitted to resign in lieu of forced termination).  (Carr Depo. pp. 107-08, 141-42; Martin Depo. p. 74)  Plaintiff learned that Gay was terminated while she was out on leave, and before the Company deemed that she had resigned. (Plaintiff's Depo. p. 96)

Based on these undisputed facts, and applying the judicial precedent hereinafter set forth, Defendant respectfully contends the entry of summary judgment is warranted as to each and every cause of action of the Complaint.

In the alternative, Defendant respectfully requests that Plaintiff be deemed ineligible to demand front-pay at a trial of this action, and further, that her potential back pay recovery be limited to the period between her discharge and the date that ADP discovered that she was working full-time at another company, under the doctrine of after-acquired evidence.

## III.     ARGUMENT

**A.     The Standard on a Motion for Summary Judgment**

A moving party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any" demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  See also Scagliotti v. DeLucca, Civ. No. 3:97CV1923 (AWT), 2000 WL 303433, at *2 (D. Conn. Feb. 16, 2000) ("Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial") (citations

omitted); <u>Beckman v. United States Postal Serv.</u>, 79 F.Supp.2d 394, 399 (S.D.N.Y. 2000). The moving party's burden is satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. <u>See, e.g.</u>, <u>Goenaga v. March of Dimes Birth Defects Foundation</u>, 51 F.3d 14, 18 (2d Cir. 1995); <u>Celotex</u>, 477 U.S. at 322-23. The non-moving party must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

Summary judgment is appropriate even in employment cases despite that intent is at issue. <u>See, e.g.</u>, <u>Murphy v. Board of Ed. of Rochester City School Dist.</u>, 273 F.Supp.2d 292 (W.D.N.Y. 2003); <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001); <u>cert. denied</u>, 534 U.S. 993 (2001); <u>Cooper v. Wyeth Ayerst Lederle</u>, 106 F.Supp.2d 479 (S.D.N.Y. 2000). <u>See also</u>, <u>Leson v. Ari of Connecticut</u>, 51 F.Supp.2d 135, 139-40 (D.Conn. 1999); <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir.), <u>cert. denied</u>, 474 U.S. 829 (1985). When applying these standards, it becomes clear that Plaintiff cannot proffer concrete evidence demonstrating the existence of disputed issues of material fact, and therefore, Defendant ADP is entitled to judgment as a matter of law.

**B.    Plaintiff Cannot Establish A Prima Facie Case of Hostile Work Environment**

To establish a prima facie case of hostile work environment sexual harassment, Plaintiff must prove that she was subjected to unwelcome conduct because of her gender that was so extreme as to create an objective change in the terms and conditions of her employment. <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998).[4] For the workplace to be deemed a sexually hostile work environment, it:

---

[4]  In analyzing discrimination and harassment claims under Connecticut law, Connecticut courts rely on the federal courts' interpretation of Title VII. <u>See, e.g.</u>, <u>Levy v. Commission on Human Rights & Opportunities</u>, 236 Conn. 96, 103 (1996). <u>See also</u> <u>Brittell v. Department of Corrections</u>, 247 Conn. 148, 164 (1998); <u>Rennie v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO,CLC</u>, 38 F.Supp.2d 209, 214 (D. Conn. 1999).

must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. . . . [Courts must look] at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (citations omitted).    Plaintiff must establish by competent evidence that her workplace was permeated with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive". Oncale, 523 U.S. at 78 (citing, Harris v. Forklift, 510 U.S. 17, 23 (1993)); Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310 (2d Cir. 1999); Lyon v. Jones, 260 F.Supp.2d 507 (D.Conn. 2003), aff'd, 2004 WL 628879 (2d Cir. 2004).

Thus, sporadic, gender neutral incidents, such as those alleged by Plaintiff, are insufficient to support a claim of hostile environment harassment. Faragher, 524 U.S. at 787, n.1 (citations omitted); Carrero v. New York City Housing Authority, 890 F.2d 569, 577-78 (2d Cir. 1989).  In analyzing hostile work environment claims, courts must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [even] gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788 (citations omitted). See also Oncale, 523 U.S. at 102.

**(i)    The Alleged Incidents, Even If True, Are Not Based on Gender**

As previously established, Plaintiff alleges that the following incidents created a hostile environment: (1) on one occasion, her supervisor, Gay, approached Plaintiff from behind and grabbed her arm; while doing so, he brushed Plaintiff's breast with the side of his hands[5] (Plaintiff's Depo. pp. 61-63); (2) Gay repeatedly used the "f" word and acted "inappropriately" (Plaintiff's

---

[5]  It is interesting to note that although Plaintiff claims that this incident was extremely upsetting to her, she never told her psychologist, Dr. Conter, that her "breast" had been touched or that she was being sexually harassed. (Conter Depo. pp. 72-73)

Depo. p. 65; Complaint ¶ 20); (3) on another occasion, Gay grabbed the lapels of Plaintiff's coat and, in an angry tone of voice said, "what was your day like?" (Plaintiff's Depo. pp. 69-70); (4) on one occasion, Plaintiff saw Gay swing a co-worker around in a bear hug (Plaintiff's Depo. p. 48); (5) Gay was about to grab another one of Plaintiff's co-workers in a bear hug, but stopped short when he realized that she was holding a cup of coffee (Plaintiff's Depo. p. 47); and (6) she witnessed Gay giving a "back rub" to another female employee. (Plaintiff's Depo. p. 110)

Even if all such incidents occurred as Plaintiff describes, such conduct, on its face, is not so clearly related to gender so as to give rise to a hostile work environment claim.  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).  See also Figueroa v. City of New York, Civ. No. 7559(SAS), 2002 WL 31163880, *2 (S.D.N.Y. Sept. 27, 2002) (citations omitted); Oncale, 523 U.S. at 81.  Workplace harassment between men and women is not automatically discrimination "because of sex," even where the words used have sexual content or connotations.  The critical issue is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.  Id. (citing, Harris, 510 U.S. at 25).

In addition to not being obviously related to gender on their face, Plaintiff has failed to proffer any "circumstantial" evidence that these incidents were related to gender.  First, with respect to the allegations of crude language, Plaintiff admitted under oath that Gay's use of profanity was not related to sex.  (Plaintiff's Depo. pp. 65, 70)  Moreover, Plaintiff could not dispute testimony proffered by a number of defense witnesses that members of both sexes used, and were subjected to, profanity both around the office and in sales meetings.  (Gay Depo. pp. 43, 95; Kehl Depo. pp. 32-33, 36; Kitzmiller Depo. pp. 6-7, 103; Carr Depo. pp. 147-48)  For example, Jill Kehl, another supervisor in Plaintiff's office, testified that virtually everyone, at both the sales level and the management level, used profanity on occasion.  (Kehl Depo. pp. 32-33)  Similarly, Carr testified that he also had discovered that the use of profanity was rampant in the department, and thus, unrelated to sex.  (Carr

Depo. pp. 147-48)  In the face of such undisputed testimony that Gay did not single out members of any particular gender at whom to target that language, coupled with Plaintiff's own admission that the profanity was not about "sex", there is no doubt that this conduct cannot be deemed gender-based.

Persuasive on this point is the ruling in <u>Benette v. Cinemark U.S.A., Inc</u>.  Benette brought a claim for hostile environment harassment against her employer based primarily upon the vulgar language used by her supervisor, Jones, including his repeated use of the word "fuck."  295 F. Supp.2d 243 (W.D.N.Y. 2003).   However, the evidence showed that Jones used this language to all who were within earshot, irrespective of gender or rank.  In granting the employer's motion for summary judgment, the <u>Benette</u> court noted: "[t]he nation's workplace is most likely populated with abusive, banal, profane and vulgar supervisors," who "use insensitive, profane and vulgar language toward employees.  Such evidence, though, is insufficient to make out a claim for discrimination." <u>Id.</u> at 250.  In reaching this conclusion, the District Court relied on the fact that Benette had not established that Jones' conduct had occurred <u>because</u> Benette was a woman, or that his crude language was directed solely at her and not also at her male counterparts.  <u>Id.</u> at 250-51.  Likewise here, the fact that Gay might have used vulgar language in Plaintiff's presence is not sufficient to establish a claim for discrimination.

Second, Plaintiff's attempt to rely on either purported "grabbing" incident to establish gender-based conduct is equally unavailing.  Once again, Plaintiff <u>admitted</u> at her deposition that this conduct was not related to "sex".  (Plaintiff's Depo. p. 70)   In addition to admitting "sexual harassment" was not involved, Plaintiff has never proffered evidence to establish Gay inflicted this purported treatment on her because of her gender by, among other things, establishing disparate treatment by Gay of females as opposed to males.  For example, in <u>Figueroa v. City of New York</u>, 2002 WL 31163880 (S.D.N.Y. Sept. 27, 2002), the court reversed a denial of summary judgment as

to plaintiff's gender based sexual harassment claims which included sexual remarks by co-workers and an allegation that her supervisor consistently reprimanded her. In her deposition, she testified to a conclusion that the fact these incidents occurred, and her supervisor's treatment of her, were based on her gender. When pressed for reasons why she concluded gender was the motivating factor, she simply repeated it was because she was female, and could not point to discriminatory or disparate treatment of other females as opposed to the treatment of males. In dismissing the claim, the court opined: "Courts have repeatedly granted summary judgment where the evidence points, not to gender…animus, but rather to the fact that plaintiff's personality is the motivation for the harassment." See, e.g., Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002); Kodengaga v. Int'l Bus. Mach. Corp., 88 F.Supp.2d 236, 243 (S.D.N.Y.), aff'd 242 F.3d 366 (2d Cir. 2000)(dismissing hostile work environment claim where, *inter alia*, evidence showed that the hostility plaintiff encountered largely reflected a clash of personalities rather than discriminatory animus). Indeed, the Figueroa court focused on plaintiff's failure to proffer sufficient evidence that males were not treated in a hostile manner and that other females were so treated. Id. at *3-4.

In short, Plaintiff fails to proffer any evidence whatsoever that Gay "grabbed her" because of her gender, or directed "grabbing" at females in general because of gender bias. Indeed, then, the only allegation by Plaintiff even remotely suggestive of sex or gender based conduct would be that one occasion on which he purportedly brushed up against her breast while "grabbing her arm from behind." While Plaintiff opines this "brushing" was intentional (Plaintiff's Depo. p. 61), she provides no factual basis for that opinion. However, again, even if advertent, this one incident does not suffice to salvage her claims here, based on clear judicial precedent.

In this regard, the case of Brennan v. Metropolitan Opera Association is likewise instructive. 192 F.3d 310 (2d Cir. 1999). In Brennan, the plaintiff alleged that: (1) her boss criticized her work, acted in a hostile, degrading, and demeaning manner towards her, and was rude to her; (2)

her co-workers had pictures of semi-clothed and nude men on the bulletin boards where they worked; and (3) a superior engaged in "lewd banter" when he said to her supervisor in her presence, "do you want to do it now?" and pointed to his crotch. Despite these allegations, the Second Circuit upheld summary judgment in favor of the defendant on the plaintiff's claim for hostile environment harassment because there was no indication that the plaintiff's supervisor had mistreated her on the basis of sex. Id. See also Alfano, 294 F.3d at 377 (in holding that the plaintiff's allegations did not amount to a violation of Title VII, the Second Circuit stated, "[s]everal more of these incidents must be removed from consideration, however, because even though they can support an inference that Alfano [the plaintiff] was mistreated, they do not support an inference that this was because of her sex"); Rizzo-Puccio, 71 F.Supp.2d 47 (N.D.N.Y. 1999), aff'd mem., 216 F.3d 1072 (2d Cir. 2000)(granting summary judgment in favor of defendant on plaintiff's hostile environment claim because plaintiff had failed to establish that the supervisor's actions were gender-based). Accord, Dawson v. Bumble & Bumble, 246 F.Supp.2d 301, 326 (S.D.N.Y. 2003); Figueroa, 2002 WL 31163880, at *2-3; Lyon, 260 F.Supp.2d at 512-13.

With respect to the remaining incidents which were merely witnessed by Plaintiff and did not involve any conduct directed at her whatsoever [6] -- Plaintiff again cannot establish that any of these actions, even if harassing, were motivated by discriminatory intent. In sum, not only has Plaintiff failed to proffer any evidence demonstrating that the incidents of which she complains were related to her sex, but her own testimony belies such an inference. Accordingly, Plaintiff's claims for sexual harassment fail as a matter of law.

---

[6]  Numerous courts have held that harmless body contact of a non-sexual nature fall outside even the broadest parameters of sexual harassment. See, e.g., Lucas v. South Nassau Communities Hosp., 54 F.Supp.2d 141, 147 (E.D.N.Y. 1998). Accord, Lamar v. Nynex Service Co., 891 F.Supp. 184, 185 (S.D.N.Y. 1995).

(ii)    **The Alleged Conduct Was Not Severe or Pervasive**

Even if Gay's actions are deemed to be gender-based, Plaintiff's claims nevertheless fail as the alleged incidents of harassment, even in the aggregate, are insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a viable claim of hostile work environment harassment.  Thus, the subject conduct is beyond the purview of Title VII.  Harris, 510 U.S. at 21.  In this analysis, Plaintiff's subjective perception that her workplace was hostile would not bolster her attempt to state an actionable claim for sexual harassment; rather, the Court must find that the environment was objectively hostile.  Shabat v. Blue Cross Blue Shield of the Rochester Area, 925 F.Supp. 977, 982-83(W.D.N.Y. 1996), aff'd mem., 108 F.3d 1370 (2d Cir. 1997).

In determining whether the work environment is objectively hostile, the Court must consider the totality of circumstances.  See Brennan, 192 F.3d at 319.  Factors to weigh include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance;' and (4) whether the conduct unreasonably interfered with the plaintiff's work.  Id.  See also Leson, 51 F.Supp.2d 135.  Episodic incidents are insufficient to support this type of claim; rather, the incidents must be "sufficiently continuous and concerted in order to be pervasive."  Faragher, 524 U.S. at 787 & n.1 (citations omitted); Carrero v. New York City Housing Authority, 890 F.2d 569, 577-78 (2d Cir. 1989).  See also Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).  Based on these standards, none of the alleged incidents of harassment in this action, even in the aggregate, and even including the alleged brushing against Plaintiff's breast, come close to the requisite level of severity needed to state an actionable claim for hostile environment harassment.

For example, in Quinn v. Green Tree Credit Corp., the plaintiff alleged that she had been subjected to over thirty separate incidents of sexual harassment.  The alleged incidents consisted primarily of sexual comments made to the plaintiff by her supervisor concerning his sexual prowess

and her body parts, including that she had been voted the "sleekest ass" in the office.  The plaintiff also alleged that she was subjected to pornography, simulated sex acts, and that her supervisor <u>deliberately</u> <u>touched</u> <u>her</u> <u>breasts</u> <u>with</u> <u>paper</u>.  The Second Circuit affirmed the district court's grant of summary judgment in favor of the defendant on the grounds that the supervisor's alleged acts were not sufficiently severe to create a hostile work environment.  159 F.3d 759 (2d Cir. 1998).

Similarly, in <u>Christoforou v. Ryder Truck Rental, Inc.</u>, the plaintiff alleged that: (1) her supervisor had touched her sexually on several occasions, including once when he grabbed her from behind and <u>placed both of his hands on her breasts;</u> (2) her supervisor had been "personal" with her; and (3) her supervisor had asked her out on dates on several separate occasions.  Despite these allegations, the District Court held that the plaintiff's assertions did not rise to the level of an actionable claim for hostile environment harassment. 668 F.Supp. 294 (S.D.N.Y. 1987).  <u>See also</u>, <u>Spina v. Our Lady of Mercy Medical Center</u>, No. 97 Civ.4661 RCC, 2003 WL 22434143 (S.D.N.Y. Oct. 23, 2003) (six incidents of harassment, including supervisor's compliments regarding plaintiff's eyes and hair, comments that the plaintiff looked good in tight pants, referring to the plaintiff as "bitch," leering at plaintiff, and yelling at her and pointing his finger in the plaintiff's face, were not sufficiently pervasive to create a hostile environment); <u>O'Dell v. Trans World Entertainment Corp.</u>, 153 F.Supp.2d 378 (S.D.N.Y. 2001), <u>aff'd mem.</u>, 2002 WL 1560266 (2001)(summary judgment granted on plaintiff's sex harassment claim because supervisor's actions, which consisted of repeatedly asking the plaintiff out, making comments about her appearance, sending her emails professing his love, calling her at work and home, and giving her gifts, did not occur with a regularity that could be termed "pervasive").

Consequently, Plaintiff has failed to set forth sufficient facts showing that the so-called harassment was pervasive enough to create the sort of "poisoned" atmosphere that courts have required of successful plaintiffs.  <u>Christoforou</u>, 668 F.Supp. at 301 ("[s]uccessful 'hostile

environment' claims have depended on the existence of a 'poisoned' atmosphere . . . where the individual is required to run 'a gauntlet of sexual abuse in return for the privilege of being allowed to work'") (citation omitted).  At most, Plaintiff has shown that she was subjected to a few isolated incidents of inappropriate behavior by her supervisor which clearly fall short of the level of conduct necessary to find that her workplace was permeated with harassing conduct.

Indeed, recent courts continue to dismiss cases where even more egregious conduct is held to fall short of being sufficiently severe or pervasive.  See, e.g., Feliciano v. Alpha Sector, Inc. and Kingsman Group, No. Civ. 9309(AGS), 2002 WL 1492139 (S.D.N.Y. July 12, 2002) (supervisor's unwelcome romantic overtures toward plaintiff, which included compliments, requests for dates, hugging her, kissing her, and stating that he wanted to "lay with" her, did not constitute actionable offenses under Title VII); Medina v. New York City Transit Authority, 242 F.Supp.2d 284 (S.D.N.Y. 2002) (summary judgment granted finding that a single incident of an alleged back rubbing by a coworker, who then reacted angrily after the plaintiff objected to the back rub, telling the plaintiff he could make things hard for her, was insufficiently severe to alter the plaintiff's conditions of employment); Salvatore v. KLM Royal Dutch Airlines, No. 98 Civ. 2450 (LAP), 1999 WL 796172, at *11 (S.D.N.Y. Sept. 30, 1999) (holding that the plaintiff's allegations that her supervisor brushed up against her on several occasions and made embarrassing sexually-charged comments did not amount to actionable sexual harassment); Gregg v. New York State Dep't of Taxation & Finance, No. 97 Civ. 1408, 1999 WL 225534, at *3, 12 (S.D.N.Y. Apr. 19, 1999) (granting summary judgment where plaintiff alleged inappropriate comments and four instances of offensive touching, including a "pat[ ] on the behind").  Clearly then, the allegations made by Plaintiff here, even if true, are blatantly less severe and more isolated than those alleged by the plaintiffs in these dismissed cases.  Accordingly, ADP is entitled to summary judgment as a matter of law.

**C.    Plaintiff's Hostile Environment Claims Are Also
Barred Based On ADP's  Prompt, Remedial Action**

Even assuming that Plaintiff somehow can establish that she was subjected to a hostile work environment actionable under either federal or state law, these claims are nevertheless barred because no tangible employment action was taken against her and it is undisputed that: (a) ADP took prompt, remedial action as soon as it learned of the alleged harassment; and (b) Plaintiff was unreasonable in taking advantage of the corrective opportunities provided by ADP.  Faragher, 425 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Hill v. The Children's Village, 196 F.Supp.2d 389 (S.D.N.Y. 2002).

As explained more fully in Section D(i)(b), below, a "tangible [adverse] employment action" is a significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  See Hill, 196 F.Supp.2d at 396-97.  Here, Plaintiff has not shown, and cannot show, that any of the actions of which she complains satisfy the "significant change" principles enumerated in Faragher and its progeny.  Plaintiff may attempt to argue that her alleged constructive discharge constitutes a "tangible employment action," as that term is used in Faragher and Ellerth; however, such an attempt would be misplaced. The Second Circuit unequivocally has held that the theory of "constructive discharge is not a tangible employment action depriving the employer of the availability of the affirmative defense to Title VII liability." (emphasis added)  See Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 295 (2d Cir. 1999), cert. denied, 529 U.S. 1107 (2000). Additionally, it is undisputed that Plaintiff's job position, title, salary, and responsibilities remained the same after she complained.

Not only is it clear that Plaintiff did not suffer a tangible employment action, but it also is clear that ADP took preventive measures to prevent harassment, immediately investigated Plaintiff's complaints, and took appropriate, corrective action.  First, ADP undisputedly maintained an anti-harassment and discrimination policy and internal complaint procedure.  (Dank Depo. pp. 93-94 and Ex. Q)  Plaintiff demonstrated her awareness of that procedure by utilizing it.  (Complaint ¶¶ 9, 11, 13, 14, 15)  Then, within days of receiving Plaintiff's complaint, ADP commenced an investigation.  After interviewing the affected employees, it was determined that Gay had potentially engaged in some unacceptable conduct; specifically, Gay admittedly may have grabbed Plaintiff's lapel and had, in fact, used profanity in the office. Therefore, Gay was given a verbal reprimand. (Kitzmiller Depo. pp. 4-5; Gay Depo. p. 53; Carr Depo. pp. 65-66)  Shortly thereafter, Kitzmiller, on December 11, followed up with Plaintiff and told her that the matter had been addressed with Gay, and that her reporting structure had been changed so she no longer had to report to Gay.  (Kitzmiller Depo. p. 102; Carr Depo. pp. 70-71, 150-51; Plaintiff Depo. pp. 90-91, 108-109, 133)  Plaintiff complained on November 26, 2001, and she was out on leave from November 30 until December 10. (Plaintiff Depo. p. 133)  Thus, during the period between her complaint and her return from leave, she had no contact with Gay.  Again, even after December 11, her contact with Gay was remote and sporadic at best; indeed, Plaintiff herself admits that her subsequent encounters with Gay were limited to Gay asking her for sales figures on several occasions[7], and one incident where Gay was standing near her at an office Christmas party.  (Plaintiff's Depo. pp. 109-12)  Finally, as of February 14, 2002, Plaintiff left on medical leave, and never returned to ADP.  (Carr Depo. pp. 113-14, 154) Prior to her job abandonment, Gay left the Company.  (Carr Depo. pp. 107-08, 141-42; Martin Depo. p. 74)  Thus, it is undisputed that the purportedly harassing conduct toward Plaintiff did not continue after her internal complaint.

---

[7] Gay denies asking for Plaintiff's sales figures after she stopped reporting to him.  (Gay Depo. p. 62)

Plaintiff makes much of the fact that Gay was "only" counseled verbally about profanity and the generic touching of employees; however, despite Plaintiff's belief that Gay should have received a more stern punishment, "nothing gives her the right to choose the penalty for her harasser." Wahlstrom v. Metro-North Commuter Railroad Co., 89 F.Supp.2d 506, 526 (S.D.N.Y. 2000). The Second Circuit has recognized that "not every response to a complaint should take the form of discharge." Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 63 (2d Cir. 1992). "An employer's remedy need not necessarily expel the harasser from the work environment to be effective, but rather it should be 'sufficiently calculated to end the harassment'." Gonzalez v. Beth Israel Medical Center, 262 F.Supp.2d, 342, 355 (S.D.N.Y. 2003). As already established here, there can be no doubt that ADP's actions were reasonably calculated to end the harassment,[8] and did end the harassment, as Plaintiff and Gay were immediately separated and a new reporting structure instituted.

Plaintiff further cannot rely on the fact that Gay allegedly harassed another employee after he received his verbal warning to bolster her inference that ADP failed to exercise reasonable care to end the alleged harassment. The Second Circuit has made it clear that an employer "need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct." Caridad, 191 F.3d at 295. See also, Arnold v. Yale New Haven Hosp., 213 F.Supp.2d 142, 150 (D. Conn. 2002); Knabe v. Boury Corp., 114 F.3d 407 (3d Cir. 1997). So, even if Gay did subsequently harass another employee, Plaintiff

---

[8] In that regard, it is important to note that when Gay was verbally counseled, ADP believed that discussion to be akin to a warning, and to be the proper course of action. There were no prior complaints against Gay and there was no indication that his acts with respect to Plaintiff were intentional. (Carr Depo. pp. 58, 60, 74-78, 145-46; Dank Depo. pp. 65, 77-78, 95) Second, while ADP concluded that Gay had acted inappropriately, it did not conclude that he had committed any acts which could be deemed sexual harassment. (Carr Depo. pp. 148-149; Dank Depo. pp. 55, 94)

has not proffered any evidence of harassment directed at, or witnessed by, her subsequent to her return on December 11.[9]

It is likewise undisputed that Plaintiff unreasonably failed to take advantage of the corrective measures implemented by ADP. Indeed, in February of 2002, Plaintiff simply just stopped coming to work, claiming that the stress and anxiety from the workplace prevented her from working,[10] even though by this time Plaintiff had stopped reporting to Gay and, by her own admission, had little or no interaction with him.  (Plaintiff's Depo. pp. 108-10, 129, 133) Furthermore, Plaintiff never returned from her medical leave despite the fact that, while out on leave, Gay had been discharged.  (Carr Depo. pp. 116-17, 141-42; Martin Depo. p. 74)  See, e.g., Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272 (11th Cir. 2003), cert. denied, 124 S.Ct. 1714 (2004)(affirming district court's holding that the plaintiff had failed to state an actionable claim for sexual harassment because, by failing to return to work after the expiration of her medical leave, she had unreasonably failed to take advantage of the company's remedial mechanisms, which included changing the plaintiff's reporting structure and eventually firing the harasser).

In view of ADP's preventive measures, its prompt remedial action, and Plaintiff's failure to take advantage of such action, liability for sexual harassment cannot, as a matter of law, be imputed to ADP.

---

[9]  Although Plaintiff avers that Gay used the "f" word within earshot after December 11, she still cannot establish that his use of foul language was tantamount to sexual harassment.  (See Section III(B), above). Furthermore, although in her Complaint (¶ 20) Plaintiff alleges that Gay acted "inappropriately" toward women, she has not substantiated this claim with any specific facts.  It is well settled that a plaintiff in a discrimination case must do more than merely present "conclusory allegations of discrimination," as Plaintiff has done here.  Meiri, 759 F.2d at 998. A plaintiff must proffer concrete particulars to substantiate her claim. Id. See also Scotto v. Almenas, 43 F.3d 105, 113-15 (2d Cir. 1998).

[10]  It is interesting to note that even though Plaintiff was ostensibly out on a stress-related disability leave and unable to work for ADP, she somehow was able to work full time at HealthWorks, a health club, during this same time period. (Plaintiff's Depo. pp. 21, 180, 183)

**D.**     **Plaintiff Has Failed to Provide Sufficient Evidence of Retaliation**

In Counts Two and Five, Plaintiff alleges unlawful retaliation in violation of Title VII and the CFEPA.[11]   Specifically, Plaintiff alleges that she was retaliated against when: (1) management failed to provide support for her in sales calls to accounting firms; (2) her commissions were unfairly split; (3) she was not included in meetings; (4) she was not permitted to offer product promotions to potential customers; (5) her sales territory was limited; (6) she was ostracized by her peers; and (7) during her medical leave of absence in January of 2002, ADP requested medical information from her to substantiate her qualification to take leave; when she did not provide this information, she was deemed to have resigned.  (Complaint ¶¶22, 30; Plaintiff's Depo. pp. 83-85, 114, 127, 130, 143-44)

Retaliation claims are analyzed under the burden shifting rules established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also, Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133 (2000); Quinn, 159 F.3d at 764.  The plaintiff must first demonstrate a prima facie case of retaliation, after which the defendant has the burden of articulating a legitimate, non-retaliatory reason for the subject action.  If the defendant meets its burden, the plaintiff must demonstrate by competent evidence that there is sufficient proof for a reasonable jury to find that the proffered legitimate reason is merely a pretext for the impermissible retaliation.

**(i)**     **Plaintiff Cannot Establish A Prima Facie Case**

In order to establish a prima facie case of retaliation, the plaintiff must show that: (a) she participated in a protected activity known to the defendant; (b) she suffered an adverse employment action; and (c) there is a causal connection between the protected activity and the

---

[11]   Again, Connecticut courts look to federal employment discrimination law for guidance in enforcing the state employment practices statutes.  Bizer v. Dep't of Labor, 742 A.2d 821, 827 (Conn. 2000).  See also Levy, 236 Conn. at 103; Brittell, 247 Conn. at 164; Rennie, 38 F.Supp.2d at 214.

adverse employment action.  See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996);

Leson, 51 F.Supp.2d at 142.  In the instant case, Plaintiff cannot satisfy any prong of this test.

### (a)    Plaintiff Cannot Establish Protected Activity

As previously established, Plaintiff's complaints essentially concerned one incident

where Gay allegedly touched her lapel; one incident where he allegedly touched her arm and, in that

movement, brushed up against her breast; and his use of foul language in the office.  No reasonable

person would conclude that such conduct, even in the aggregate, could give rise to a statutorily

protected claim.  As the Supreme Court has held, in order for a sexual harassment complaint to be the

basis for a retaliation claim, the underlying sexual harassment must have been "objectively

offensive".  See Clark County Sch. Dist. V. Breeden, 532 U.S. 268, 270-72 (2001).  As in Breeden,

Plaintiff here cannot sustain her burden of proving that, as opposed to her subjective, unreasonable

conclusions, the conduct of which she complained actually violated Title VII/comparable state law,

or, in the alternative, that a reasonable person, in good faith, could believe the conduct of which she

complained constituted actionable sexual harassment.  Thus, her retaliation claim should be rejected

outright.

### (b)    Plaintiff Cannot Establish Adverse Action

To constitute an "adverse employment action," a plaintiff must demonstrate that an

employment action was one that resulted in a "materially adverse change in terms and conditions of

employment."  Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997), cert. denied, 522 U.S. 997 (1997);

Arnold, 213 F.Supp. 2d at 150.   In order to be considered materially adverse, the "change in working

conditions must be more disruptive than a mere inconvenience or an alteration of job

responsibilities."  Spina, 2003 WL 22434143, at *3.  Indeed, a materially adverse change "constitutes

a significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in benefits . . .

A tangible employment action in most cases inflicts direct economic harm." <u>Ellerth</u>, 118 S.Ct. at 2268.  An adverse employment action is not every action that an employee dislikes or disagrees with; rather, a reasonable person must view the decision as adverse.  <u>Doe v. Dekalb County School Dist.</u>, 145 F.3d 1441, 1449 (11th Cir. 1998).

In the instant case, no reasonable person could view the events of which Plaintiff complains as being materially adverse.  Plaintiff herself never alleges that she suffered any economic harm as a result of the so-called retaliation, nor does she allege demotion, probation, or loss of status, job security, earning potential, salary, benefits, or seniority.  By contrast, Plaintiff admits that after she complained, she was never counseled, never warned, never demoted, and never disciplined in any manner.  (Plaintiff Depo. p. 112)   With respect to Plaintiff's claims that management failed to provide support for her and that she was not permitted to offer product promotions to potential customers, she has provided no evidence whatsoever that these so-called changes caused her any direct economic harm.  In particular, she does not allege that her job responsibilities were diminished in any manner or that she lost any accounts or any opportunities for advancement as a result of these changes.

In addressing her allegation that commissions were unfairly split, Plaintiff explained not that commissions were "split", per se, but rather, that another sales person was permitted into her territory to sell other products. Additionally, one account was transferred into that other sales person's territory.[12]   (Plaintiff's Depo. at pp. 120-21)   When pressed to explain how these actions affected her, Plaintiff gave only a vague and illusory explanation:  "Q. Does splitting of the territory result in the splitting of commissions?   A.: Sometimes it does and sometimes you get to keep the whole commission because it was something you had been working on… Q.: I want to know which

---

[12] Interesting to note, that "other sales person" was Kristen Flaherty, another employee who later complained about Gay.

commissions you're claiming were unfairly split as a direct result of your having complained…A.: That one as well as other products that were being sold in my territory that somebody else came in to sell the product. Q.: Well, that did not happen all the time at ADP…? A.: No." (Plaintiff's Depo. pp. 122-26). Plaintiff then confirmed she could not recall, but for one product, whether these actions were taken before or after her internal complaint, and even with respect to the one product, she could not quantify what monetary amount, if any, was "split" between her and the other employee. (Id. See also Kitzmiller Depo. pp. 36-37, 41-42)

    With respect to all these claimed "adverse" decisions, Plaintiff clearly can point only to her subjective unhappiness as the "detriment". However, Plaintiff's subjective feelings of unhappiness or dissatisfaction with these "changes", even if true, are not enough to support a finding of adverse action. See, e.g., Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002); Harrison v. New York City Off-Track Betting Corp., No. 99 Civ. 6075 (WM), 2001 WL 1154691 (S.D.N.Y. Sept. 28, 2001). See also, Garber v. New York City Police Dep't, No. 95 Civ. 2516, 1997 WL 525396, *6 (S.D.N.Y. Aug. 22, 1997), aff'd mem., 159 F.3d 1346 (2d Cir. 1998); Leson, 51 F.Supp.2d at 142; Hunter v. Citibank, N.A., 862 F.Supp. 902, 908 (E.D.N.Y. 1994), aff'd mem., 60 F.3d 810 (2d Cir. 1995). Similarly, Plaintiff cannot rely on her allegations that she was excluded from meetings and ostracized by her peers to save her defective claim. Without attendant factual support, Plaintiff's subjective perception that she was ostracized is not sufficient to support a claim that the employment action was adverse. See, e.g., Arnold, 213 F.Supp.2d at 147 ("to the extent that [the Plaintiff] feels that … nurses are giving him the 'cold shoulder' his subjective feelings are not sufficient to support his allegations that he was the victim of an adverse employment action"); Kent v. General Motors Regional Personnel Center – East Region, 179 F.Supp.2d 102, 116 (W.D.N.Y. 2001)(plaintiff failed to "put forth any evidence, beyond her unsubstantiated, conclusory deposition testimony, to raise a genuine issue of fact as to whether being excluded from a meeting, enduring insulting remarks, being

ignored by co-workers, or not being told about a job opening cause a materially adverse change in the terms and conditions of her employment"). See also, Dayes v. Pace Univ., No. 98 Civ. 3675(WHP), 2000 WL 307382, at *5-6 (S.D.N.Y March 24, 2000), aff'd, 2001 WL 99831 (2d Cir. Feb. 5, 2001); Brunson v. Bayer Corp., 237 F.Supp.2d 192, 204-06 (D. Conn. 2002); Bunis v. Runyon, 94 Civ. 2063 (JFK), 1997 WL 639241, at * 3 (S.D.N.Y. Oct. 16, 1997).

Equally without merit is Plaintiff's claim that her sales territory was limited as a result of her complaints to management. Indeed, at her deposition, Plaintiff admitted that this change took place in July of 2001, more than four months before she complained about the alleged harassment, and well before Gay even became her supervisor. (Plaintiff's Depo. p. 130) Thus it defies logic for Plaintiff now to suggest "adverse action" as a result.

Finally, Plaintiff's own testimony belies her allegation that ADP's request for medical information was in retaliation for her complaints. Indeed, Plaintiff admits that it was standard procedure for ADP to require medical certification from employees who were out on leave. (Plaintiff's Depo. pp. 145-46) Furthermore, it is well-established by the courts that requiring an employee to provide a doctor's certification while she is out on a medical leave does not constitute "adverse action". See, e.g., O'Dell v. Trans World Entertainment Corp., 153 F.Supp.2d 378, 396 (S.D.N.Y. 2001) ("even if [defendant's] request was retaliatory, requiring documentation for sick leave is not an adverse employment action"); Nicastro v. Runyon, 60 F.Supp.2d 181, 186 (S.D.N.Y 1999) ("many of the actions complained of by plaintiff, such as … requiring documentation for sick leave … do not constitute 'adverse employment actions' and so cannot be the basis of any claim of Title VII retaliation").

To the extent her failure to complete these forms led to the Company's determination of job abandonment, Plaintiff likewise cannot claim such determination constituted adverse action. On the contrary, the record reflects repeated communications from ADP specifying its purpose in

sending the certification forms, clearly based on Plaintiff's representations that she was ill and on an FMLA-qualified leave.  (See Ex. M; Ex. O)  She perpetuated this myth by sending one, back-dated doctor's note.  (Plaintiff's Depo. p. 18; Ex. L; Carr Depo. pp. 119-20)  In sum, Plaintiff fails to satisfy the second prong of her prima facie burden—proof of an adverse action.  See, e.g., Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57-59 (2d Cir. 2004); Parisi v. Buffalo v. Municipal Housing Auth., No. 01-CV-0171E(SR), 2003 WL 21382893 (W.D.N.Y Feb. 14, 2003).  See also, Reyes v. New York State Office of Children and Family Services, Civ. 7693(SHS), 2003 WL 21709407, *9 (S.D.N.Y. July 22, 2003).

**(c)    Plaintiff Cannot Show A Causal Connection**

As to the third requirement imposed for the prima facie case, Plaintiff again fails to sustain her burden.  First, Plaintiff cannot demonstrate that any of her peers who purportedly "ostracized" her knew of her complaints about Gay.  (Plaintiff's Depo. pp. 85-88)  She also cannot prove that Gay even knew she made complaints about him which could reasonably be construed as legally protected—indeed, defense witnesses revealed that Plaintiff's claim of the touching of her breast was not even mentioned to Gay by his superior, Kitzmiller.  (Dank Depo. pp. 38-39; Kitzmiller Depo. p. 8) Gay was told that all, unspecified touching was prohibited, as well as his use of profanity.  (Kitzmiller Depo. pp. 4-5; Gay Depo. p. 53; Carr Depo. pp. 65-66)  Moreover, Gay no longer supervised Plaintiff after December 11, and thus, could not have retaliated against her.

Moreover, here as well, Plaintiff cannot establish that the requests for medical information, and the ultimate conclusion of job abandonment when she did not fulfill those requests, were attributable to her complaints about Gay.  The Company had every right to conclude that her failure to comply with clearly articulated and repeated certification requirements, coupled with her failure to even ask to return to work, constituted job abandonment.  Plaintiff's own testimony underscores the disingenuous nature of her assertions on this point. (Plaintiff's Depo. pp. 145-46)  In

sum, proof of the requisite causal connection between the alleged adverse actions and Plaintiff's claimed protected activity is blatantly absent.  In the alternative, the record in this case is equally void of any indirect evidence of disparate treatment that similarly situated employees who engaged in similar conduct were treated in a dissimilar manner than Plaintiff.  See Van Zant, 80 F.3d at 713; Johnson, 931 F.2d at 207; DeCintio, 821 F.2d at 115.  See also, Spadola, 242 F. Supp.2d 284 (summary judgment granted on claim of retaliation where, among other reasons, plaintiff failed to establish the requisite causal connection between the protected activity and the adverse employment action); Morales v. Human Rights Div., 878 F. Supp. 653, 659 (S.D.N.Y. 1995) ("An employer's knowledge of the filing of a prior complaint of discrimination, without more, is insufficient to prove a retaliatory motive").

As Plaintiff cannot prove any connection between the internal complaint about Gay and any of the actions of which she complains (especially given her failure to point to disparate treatment of others), her retaliation claims fail as a matter of law.

### (ii)      ADP Has Articulated a Legitimate, Non-Retaliatory Reason

Even if Plaintiff could satisfy her burden of establishing the requisite elements of a prima facie case of retaliation, ADP has proffered a non-discriminatory and non-retaliatory reason for the only potentially "adverse" decision of which she complains, i.e., the determination of job abandonment.  As previously stated, it was Plaintiff's representation about needing a leave of absence, and her subsequent inaction, which led to her deemed resignation.  (Ex. J; Ex. K; Ex. L; Ex. M; Carr Depo. pp. 119-20)  Based on the culmination of representations by Plaintiff and her physician, ADP continued to pay Plaintiff her full salary and provide full benefits.  After a number of opportunities provided were exhausted, ADP assumed that Plaintiff had abandoned her job. Accordingly, on April 3, 2002, Carr wrote Plaintiff a final letter, consistent with ADP's written job abandonment policy, that she was deemed to have resigned effective March 29.  (Ex. O)

From these facts it is apparent that ADP made every effort <u>not</u> to discharge Plaintiff, and therefore, ADP should be deemed to have met its burden at this procedural stage.  <u>See, e.g.,</u> <u>Brunson v. Bayer,</u> 237 F.Supp.2d 192 (D. Conn. 2002) (after internal sexual harassment complaint and investigation, the employer discharged the alleged harasser.  Plaintiff alleged her co-workers began ostracizing her in retaliation for her complaints.  Shortly thereafter, she went out on medical leave.  When she failed to return at the expiration of her leave, she was discharged for job abandonment.  The court granted summary judgment in favor of the defendant-employer, holding that the plaintiff had been discharged for a legitimate reason and not in retaliation for her complaints); <u>Richardson v. New York State Department of Correctional Service,</u> 180 F.3d 426 (2d Cir 1999)(plaintiff alleged hostile work environment which necessitated her taking several leaves of absence. She further claimed retaliation and constructive discharge when, during her final leave of absence, the company deemed her to have resigned when she failed to respond to its request for medical documentation justifying her continued absence.  Court granted summary judgment, holding that the plaintiff's failure to respond to the company's legitimate request to provide documentation supporting her leave of absence constituted a legitimate, non-discriminatory reason for terminating the plaintiff's employment).  <u>See also, Munck v. New Haven Savings Bank,</u> 251 F.Supp.2d 1078, 1087 (D. Conn. 2003) and <u>Forde v. IBM Corp.,</u> Civ. 6888(JSR), 2003 WL 740220, *4 (S.D.N.Y. March 4, 2003) (both examples of decisions where job abandonment sufficed as legitimate business reasons for discharge).

### (iii)    Plaintiff is Unable to Prove Pretext

As Defendant has articulated a legitimate, non-retaliatory reason for its actions, it "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  <u>Mario v. P & C Food Markets, Inc.,</u> 313 F.3d 758, 767 (2d Cir. 2002)(citations omitted).  Thus, Plaintiff must prove "by a preponderance of the

evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000). Merely suggesting that the employer's justification is false is not sufficient for a plaintiff to survive a summary judgment motion; rather, the Court must examine the entire record to determine whether the plaintiff could satisfy her ultimate burden of persuading the trier of fact that the defendant intentionally discriminated or, in this context, retaliated against her. <u>See, e.g.</u>, <u>Alphonse v. State of Connecticut Dep't of Admin. Services</u>, No. Civ. 3:02 CV 1195(MRK), 2004 WL 904076, *5 (D. Conn. April 21, 2004).

In the instant case, ADP has demonstrated that its decision to deem Plaintiff to have resigned was based on a legitimate, non-retaliatory reason. In turn, for those same reasons set forth above, it is clear that Plaintiff cannot proffer one shred of evidence to contradict this reason. Instead, she leaps to the unsubstantiated and unsupportable conclusion that ADP was motivated by a desire to retaliate against her, a leap of faith insufficient to sustain her burden at this stage and thereby defeat ADP's Motion. <u>See, e.g.</u>, <u>Munck</u>, 251 F.Supp.2d at 1087-89 (plaintiff's burden to show pretext failed on defendant's proffered reason for discharge of job abandonment); <u>Aguirre v. New York State Police</u>, 156 F.Supp.2d 305, 317 (S.D.N.Y. 2001) ("[s]ummary judgment is also appropriate when the plaintiff can supply no evidence that his employer's justification was a pretext"); <u>Pealo v. AAF McQuay, Inc.</u>, 140 F.Supp.2d 233, 240 (N.D.N.Y. 2001) (summary judgment granted because plaintiff had offered no proof that the defendant's reason for his dismissal was false or untrustworthy). <u>Accord</u>, <u>Meiri</u>, 759 F.2d at 998; <u>Francis v. Chemical Banking Corp.</u>, 62 F.Supp.2d 948 (E.D.N.Y. 1999), <u>aff'd</u>, 213 F.3d 626 (2d Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 949 (2001).

**E.    Plaintiff Was Not Constructively Discharged.**

In Counts Three and Six, Plaintiff alleges that she was constructively discharged from her employment because of her sex in violation of both state and federal law. Yet, again, Plaintiff has

failed to state an actionable claim.[13]  First, Plaintiff's departure from ADP was of her own volition by not fulfilling the requirements for leave certification, and not returning to work—certainly not a "deliberate" act on Defendant's part.  Second, ADP's treatment of Plaintiff cannot even remotely be described as intolerable.  Third, Plaintiff had other options available to her, rather than resigning.

In order to state an actionable claim of constructive discharge, a plaintiff must allege two elements.  First, the plaintiff must show that the defendant acted "deliberately" to create an intolerable work environment.  Pena v. Brattleboro Retreat, 702 F.2d 322 (2d Cir. 1983);[14] Lesson, 51 F.Supp.2d at 142.  "Deliberateness exists only if the actions complained of 'were intended by the employer as an effort to force the employee to quit.'"  Lombardo v. Oppenheimer, 701 F.Supp. 29, 31 (D. Conn. 1987) (citations omitted).  See also, Lesson, 51 F.Supp.2d at 143.  The second element requires a showing that the working conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  Pena, 702 F.2d at 325.  An employee's subjective opinion that the working conditions were "intolerable" is not sufficient to establish this element.  Id. at 325; Leson, 51 F.Supp.2d at 1423.  See also, Cooper v. Wyeth Ayerst Lederle, 106 F.Supp.2d 479, 493 (S.D.N.Y. 2000).

The standard for constructive discharge is not an easy one to satisfy.  See, e.g., Martin v. Citibank, 762 F.2d 212, 221 (2d Cir. 1985).  See also, Sedotto v. Borg-Warner Protective Services Corp., 94 F.Supp.2d 251 (D. Conn. 2000).  In this regard, the Second Circuit has held that constructive discharge cannot be established through evidence that the employee's supervisor had created working conditions that were merely "difficult" or "unpleasant."  Lucas v. South Nassau Communities Hospital, 54 F.Supp.2d 141, 149 (E.D.N.Y. 1998); Martin, 762 F.2d at 221.  Indeed, a

---

[13]  The speciousness of Plaintiff's claim is underscored by the fact that Plaintiff had already secured employment elsewhere before ADP accepted her deemed resignation.  In order to get around this fact, she now claims that she was "constructively" discharged.

[14]  In analyzing constructive discharge cases, Connecticut courts utilize the same standard employed by the federal courts.  See, e.g., Bigio v. Montagna, No. CV 0000442522S, 2003 WL 22333197 (Conn. Super. Oct. 2, 2003); Brittell, 247 Conn. at 178.

working environment can be far from perfect and yet will not be held to be "intolerable." See Cooper, 106 F.Supp.2d at 496; Martin, 762 F.2d at 221.

Plaintiff here does not even come close to meeting this stringent standard; bluntly put, she has not alleged one fact that would indicate that ADP deliberately set out to create arduous working conditions that would have caused a reasonable person in her position to resign.[15]  As previously pointed out, as soon as Plaintiff complained, ADP proceeded to deal with the accused. Additionally, her reporting structure was promptly changed, and she and Gay were separated.  Also as previously pointed out, Plaintiff admits that she had limited or no contact with Gay after her complaint (Plaintiff's Depo. pp. 109-11), and she made no additional complaints.  (Plaintiff's Depo. p. 49; Kitzmiller Depo. p. 56)  While she was out on leave, Gay was terminated after a second complaint was received from another employee.  (Carr Depo. pp. 107-108, 141-42; Martin Depo. p. 74)  After requesting leave, the Company merely proceeded to attempt to obtain the standard certification.  During that time, while providing Plaintiff with a number of opportunities to comply, her salary and benefits were continued, hardly acts of an employer trying to force an employee to resign.

These undisputed facts undercut Plaintiff's assertion that her working conditions were so intolerable that she had no option other than resignation or, in this case, job abandonment. See Parisi, 2003 WL 21382893 (employee failed to establish intolerable working conditions where plaintiff was transferred to another department); Stembridge v. City of New York, 88 F.Supp.2d 276, 283 (S.D.N.Y. 2000) (employee failed to establish intolerable working conditions where complaints of harassment were addressed by the employer and the employee was moved away from the

---

[15] Generally, constructive discharge is found where the employer has made clear and unequivocal remarks to the employee threatening termination, demotion, or a change in job status.  See, e.g., Equal Employment Opportunity Commission v. Die Fleidermaus, 77 F.Supp.2d 460, 471 (S.D.N.Y. 1999). Here, there is no evidence that ADP expressed, either explicitly or implicitly, that it intended to force Plaintiff to resign.

supervisors who allegedly were discriminating against him). <u>See also, Lee-Crespo v. Schering-Plough Del Caribe, Inc.</u>, 354 F.3d 34 (1st Cir. Dec. 31, 2003) (prompt remedial action that eliminated the intolerable working conditions, such as moving the employee away from the alleged harasser, negated a claim that the employee was forced to resign due to intolerable working conditions).

Any behavior that arguably might have rendered Plaintiff's work environment intolerable stopped as of December 11. Nevertheless, Plaintiff went on leave, never returned to work, and, at the same time, failed to adhere to the requirements of ADP's Leave of Absence Policy. It bears repeating that the specious nature of her claim is underscored by the fact that Plaintiff was already working full-time elsewhere when ADP deemed her to have resigned. (Plaintiff's Depo. p. 180 and Ex. P) Thus, what becomes obvious is that Plaintiff had no intention of remaining in ADP's employ[16] or of taking advantage of the remedial measures that the Company had instituted on her behalf. She deliberately failed to advise the Company of her real intention—never to return to ADP—in order to exploit the Company's misimpression, a misimpression she alone created, so that she could "double-dip"; <u>i.e.</u>, work full time for another employer, and simultaneously receive her full salary and benefits from ADP. This Court should not condone such duplicitous behavior by finding constructive discharge. <u>See, e.g., Cooper</u>, 106 F.Supp.2d at 496 ("[b]cause Plaintiff herself refused to explore the employer's proposed remedy for the situation she found intolerable, I must grant [defendant's] motion for summary judgment).

**F.    The Doctrine of After-Acquired Evidence Applies to Limit Damages**

In the alternative, if this Court were to find that Plaintiff has raised a material issue of fact with respect to any of her causes of action, Defendant respectfully requests that this Court rule,

---

[16] That Plaintiff had no intention of ever returning to work is underscored by the testimony of her psychologist, Dr. Conter. Indeed, Dr. Conter testified that in <u>early February</u> of 2002, Plaintiff told him that she had decided that she was never returning to ADP. (Conter Depo. pp. 56-58) Plaintiff never once suggested to Dr. Conter that this decision was anything other than voluntary or that she had been forced into this decision by ADP's actions. (<u>Id.</u>) Likewise, Plaintiff never told Dr. Conter, nor even implied to Dr. Conter, that she had been fired. (<u>Id.</u>)

as a matter of law, that Plaintiff is ineligible for front pay damages, and that her back pay should be limited to the period between March 29, 2002 (the date her salary ended) and June 4, 2003 (the date of her first deposition, when ADP learned by virtue of Plaintiff's own testimony that she was working full time elsewhere by February of 2002). (Plaintiff's Depo. pp. 179-80 and Ex. P)  Based on Plaintiff's intentionally misleading conduct as outlined above, Defendant contends that this remedy is warranted pursuant to the after-acquired evidence doctrine.  See, e.g., McKennon v. Nashville Banner Publishing Co., 115 S.Ct. 879, 886 (1995);[17] Greene v. Coach, Inc., 218 F.Supp.2d 404 (S.D.N.Y. 2002).  Accord, Vichare v. AMBAC Inc. and AMBAC Indemnity Corp., 106 F.3d 457, 467-68 (2d Cir. 1996).

As Plaintiff admitted in deposition, she received a copy of ADP's Leave Policy. (Plaintiff's Depo. pp. 157-58) She also admits that the language of this Policy is clear and means that "while you're on a leave of absence, that you cannot seek or obtain gainful employment elsewhere." (Plaintiff's Depo. p. 158)  Nevertheless, Plaintiff flagrantly violated this policy when she began working full-time at HealthWorks in January/February of 2002, while she was out on an approved leave of absence and while she was still receiving her salary and benefits from ADP.  (See Plaintiff's Depo. p. 180 and Ex. P)  It is undisputed that if ADP had learned that Plaintiff was working full-time at Healthworks while she was out on leave, her employment would have been terminated immediately, in accordance with the express provisions of ADP's Leave of Absence Policy. (Affidavit of Mac Carr, Ex. Q hereto)  Consequently, if this Motion is denied in any respect, this Court should, in the alternative, hold as a matter of law that Plaintiff is not entitled to request damages in the form of front pay, and her back pay should be limited to the period between March 29, 2002 and June 4, 2003.

---

[17] Although McKennon involved an ADA claim, its reasoning is equally applicable to Title VII claims.  Vichare v. AMBAC Inc. and AMBAC Indemnity Corp., 106 F.3d 457, 468, fn. 5 (2d Cir. 1996).

## IV.    CONCLUSION

ADP has unequivocally established that even if Plaintiff's Complaint and deposition testimony are taken as true, no genuine issues of material fact exist with respect to any of her causes of action. For all of the foregoing reasons, as well as those reasons set forth in the annexed Motion, Statement of Undisputed Facts, and the Exhibits and Affidavits submitted herewith, ADP respectfully requests that its Motion be granted in its entirety, together with such other and further relief as this Court shall deem just, equitable and proper.

THE DEFENDANT,
ADP, INC.


By:_____

Mary A. Gambardella, Esq.
Federal Bar No. ct05386
**EPSTEIN BECKER & GREEN, P.C.**
One Landmark Square, Suite 1800
Stamford, CT  06901-2681
(203) 348-3737

- and -

Steven J. Younes, Esq.
Federal Bar No. ct12408
**EPSTEIN BECKER & GREEN, P.C.**
One Landmark Square, Suite 1800
Stamford, CT  06901-2681
(203) 348-3737

## **CERTIFICATION**

The undersigned hereby certifies that a copy of the foregoing Memorandum of Law in

Support of Defendant's Motion For Summary Judgment was sent via first class mail, postage prepaid,

this 4th day of June, 2004 to counsel of record for the plaintiff as follows:

James H. Howard, Esq.
Phelon, FitzGerald & Wood, P.C.
773 Main Street
Manchester, CT  06040



_____
Mary A. Gambardella