UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELIZABETH LUPACCHINO, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 3:02 CV 2281 (MRK) |
| | : | |
| v. | : | |
| | : | |
| ADP, INC. a/k/a AUTOMATIC DATA PROCESSING, INC. | : | |
| | : | |
| Defendant. | : | June 4, 2004 |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS
<u>PURSUANT TO FEDERAL RULE 56(A)(1)</u>**

Pursuant to Federal Rule of Civil Procedure 56 (a)(1), the Defendant, ADP, Inc. ("ADP" or the "Company") hereby respectfully submits this Statement of Undisputed Facts.

1.  Plaintiff was employed by ADP as a District Manager in its Windsor, Connecticut facility from June of 1999, until she was deemed to have resigned in March of 2002.

2.  The Complaint contains six counts; Counts One and Four set forth claims of hostile work environment in violation of the Connecticut Fair Employment Practices Act, C.G.S. §§ 46a-60 (the "CFEPA"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e <u>et seq.</u> ("Title VII"), respectively; Counts Two and Five state claims of retaliation in violation of both federal and state law; and Counts Three and Six state separate causes of action for constructive discharge.

3.  Plaintiff was hired by ADP as a District Manager/Salesperson in or about June of 1999. Her job responsibilities primarily included selling payroll and tax preparation services to businesses in the area. (Complaint ¶ 4, Ex. A to Memorandum of Law)

4.  Plaintiff initially reported to Kenneth Kitzmiller, the Area Sales Executive (Plaintiff's Depo. p. 111; Kitzmiller Depo. p. 33)

ST:28895v1

5. William Gay was hired by Kitzmiller in or about November of 2001 as a District Sales Manager to oversee the Windsor, Connecticut office where Plaintiff was working. (Kitzmiller Depo. pp. 85-86; Gay Depo. pp. 18-22; Carr Depo. p. 127)

6. Gay thereafter reported directly to Kitzmiller. (Gay Depo. pp. 56-57)

7. Plaintiff began reporting to Gay promptly upon his hire. (Complaint ¶ 7)

8. Plaintiff claims that soon after she began reporting to Gay, on or about November 26, 2001, Gay approached her from behind and grabbed her arm; while doing so, he brushed his hand against her breast. (Ex. A ¶ 8; Plaintiff's Depo. pp. 61-63)

9. That same afternoon, Plaintiff went to Human Resources ("HR") and spoke with Kathy Alexander. (Ex. A ¶ 9; Plaintiff's Depo. pp. 62-63)

10. Alexander explained that Plaintiff was not in the division for which she had HR responsibility, and thus, she should expect follow-up from the appropriate person, Debbie Dank, Area Human Resources Director. (Plaintiff's Depo. pp. 74-75)

11. She also told Plaintiff to inform her if there were any interim problems with Gay. (Plaintiff's Depo. pp. 63-64)

12. Plaintiff claims that the following day, November 27, she was in attendance at a sales meeting during which Gay repeatedly used the words "fuck" and "fucking" (as adjectives). (Ex. A ¶ 10; Plaintiff's Depo. p. 65)

13. Plaintiff conceded that Gay's use of these words was not "sexual". (Plaintiff's Depo. p. 65)

14. Moreover, Plaintiff has never claimed this language was directed at her due to gender. In that regard, undisputed testimony was proffered that Gay's profanity was directed at males and females alike in the department. (Kehl Depo. pp. 32-33, 36; Kitzmiller Depo. pp. 6-7, 103; Gay Depo. pp. 43, 95, 117; Carr Depo. pp. 147-48)

15. Undisputed testimony also confirmed that many members of the department, both males and females at all levels, occasionally used profanity. (Kehl Depo. pp. 32-33; Kitzmiller Depo. pp. 6-7, 103; Gay Depo. pp. 43, 117; Carr Depo. pp. 147-48)

16. Plaintiff was offended by Gay's language, and consequently, she returned to Alexander and complained. (Ex. A ¶ 11; Plaintiff's Depo. pp. 66-67)

17. As Plaintiff was leaving the office on the evening of that same day, November 27, she claims Gay grabbed the lapels of her coat, shook her, and stated, in an intimidating tone of voice, "what was your day like?" (Ex. A ¶ 12; Plaintiff's Depo. pp. 69-70)

18. Plaintiff testified that this conduct did not constitute a sexual advance. (Plaintiff's Depo. p. 70)

19. Plaintiff complained again to Alexander. (Ex. A ¶ 13; Plaintiff's Depo. pp. 71-72)

20. In the interim, Alexander telephoned Dank and informed her that she had received complaints from Plaintiff regarding Gay. (Dank Depo. pp. 8-10)

21. By the morning of November 29, Dank and Plaintiff had begun to trade telephone calls regarding Plaintiff's complaints to Alexander. (Plaintiff's Depo. p. 76; Dank Depo. pp. 92-93)

22. Beginning November 30, Plaintiff decided to take a week off from work, and thus, she did not return until Monday, December 10. (Plaintiff's Depo. pp. 77, 82, 90-91)

23. However, during the week Plaintiff was absent, she and Dank spoke. (Plaintiff's Depo. pp. 74-76; Carr Depo. pp. 149-50)

24. Plaintiff reiterated her allegations, and was asked by Dank whether she would like her reporting structure to change. Plaintiff responded that she "wanted to think about it". (Dank Depo. pp. 60-61)

25. Plaintiff admits that between November 29 and December 10, she had no interaction with Gay whatsoever. (Plaintiff's Depo. pp. 76, 91; Gay Depo. pp. 122-24)

26. Dank promptly informed Gay's superior, Kitzmiller, of Plaintiff's complaints. (Kitzmiller Depo. pp. 5-6)

27. Dank and Kitzmiller agreed that Kitzmiller would immediately speak to Gay about the complaints. During this conversation with Gay, Gay admitted he may have touched Plaintiff's lapel, that he was frustrated with her constantly leaving early from the office, but that he did not engage in any intimidating or inappropriate behavior. Gay admitted to the use of profanity. (Gay Depo. pp. 41-43, 45-49, 53; Kitzmiller Depo. pp. 6-8, 10; Plaintiff's Depo. pp. 104-05)

28. Kitzmiller counseled Gay about the use of profanity, not just in connection with Plaintiff, but in general as constituting poor and unacceptable management style. He further cautioned Gay about any "touching" of employees. (Kitzmiller Depo. pp. 4-5, 10, 13; Gay Depo. p. 53; Carr Depo. pp. 65-66)

29. Kitzmiller emphasized that unwanted touching of any type was not acceptable at ADP. (Kitzmiller Depo. pp. 13, 101-02) Finally, he told Gay that he was going to transfer reporting responsibility for Plaintiff from Gay to himself. (Kitzmiller Depo. p. 16)

30. Kitzmiller did not ask Gay whether he intentionally (or unintentionally) touched Plaintiff's breast during one of the "touching" incidents. (Kitzmiller Depo. p. 8)

31. On December 11, the day after she returned from her week off, Plaintiff met with Dank and Kitzmiller. (Ex. A ¶¶ 18-19; Plaintiff's Depo. pp. 93-94; Carr Depo. pp. 149-51)

32. At this meeting, Kitzmiller told Plaintiff that he had already spoken to Gay about the issues she had raised. (Kitzmiller Depo. pp. 22, 102; Carr Depo. p. 70)

33. Kitzmiller also told Plaintiff that he wanted her to feel comfortable working at ADP. (Plaintiff's Depo. p. 95; Dank Depo. p. 66; Kitzmiller Depo. pp. 21-22)

34.     Accordingly, he told Plaintiff that, effective immediately, she would be reporting to him, rather than to Gay.[1]  (Ex. A ¶ 19; Plaintiff's Depo. pp. 90-91; Dank Depo. pp. 73-74; Kitzmiller Depo. pp. 22-23)

35.     Plaintiff appeared to be satisfied with this resolution.  (Dank Depo. pp. 66-67; Kitzmiller Depo. p. 23; Carr Depo. p. 152)

36.     Dank discussed the situation and the outcome with her superior, Mac Carr, the HR Area Director.  Carr agreed that the verbal counseling/warning was the appropriate course of action.  (Dank Depo. pp. 54-57; Carr Depo. pp. 46-47, 49, 63-66)

37.     Thus, as of December 11, Plaintiff never again reported to Gay.  (Plaintiff's Depo. pp. 108-09, 129, 133)

38.     As previously mentioned, between the date of her initial complaint, November 26, and December 11, Plaintiff did not interact with Gay because she was absent.  Furthermore, after December 11, she admittedly had very limited interaction with him.  Specifically, on a few occasions, Gay asked Plaintiff for her sales numbers.  (Plaintiff's Depo. pp. 109-10)

39.     Plaintiff also saw Gay at the office Christmas party.  (Plaintiff's Depo. pp. 109-10)  Thus, Plaintiff cannot point to any direct "harassment" between the date of her complaint and her ultimate departure from ADP.

40.     Kitzmiller was aware that the use of profanity was rampant in the entire department.  Thus, he held a meeting of department managers, and cautioned that the use of profanity was unprofessional and would not be permitted.  (Kitzmiller Depo. pp. 54-55, 102-03; Kehl Depo. pp. 33-34; Gay Depo. pp. 53-54)

41.     Plaintiff cannot contradict defense witness testimony that Gay was verbally counseled and admonished, nor that a management meeting was held concerning the use of profanity in general.

---

[1] Eventually, Plaintiff began reporting to Scott Martin instead of Kitzmiller. (Martin Depo. pp. 12-14)

42. Plaintiff further alleges that in January of 2002, Gay came up behind one of her co-workers and said, "it's a good thing that you have a cup of coffee in your hand because I was just getting ready to grab you." (Plaintiff's Depo. p. 47)

43. Gay also allegedly came from behind another co-worker, swung her around, and gave her a bear hug. (Plaintiff's Depo. p. 48.)

44. Finally, Plaintiff claims that she witnessed Gay giving a back rub to another co-worker. (Plaintiff's Depo. p. 110)

45. Plaintiff never complained to HR or to any member of management about these three, alleged events. (Plaintiff's Depo. p. 48; Kitzmiller Depo. p. 56) Again, Plaintiff never alleged <u>she</u> was harassed after the date of her HR complaint.

46. Plaintiff claims that after her complaint about Gay, her co-workers were "sarcastic" toward her and "ostracized" her. (Plaintiff's Depo. p. 85)

47. Plaintiff failed to offer any factual basis for her belief that such conduct, even if true, was attributable to her complaint; indeed, she cannot prove these co-workers had knowledge of the fact or nature of her complaints. (Plaintiff's Depo. pp. 85-88)

48. Plaintiff further alleges that ADP failed to provide support for her sales calls. (Ex. A ¶ 22; Plaintiff's Depo. p. 114)

49. Specifically, she claims that Rose Kitzmiller, Ken Kitzmiller's wife, was scheduled to accompany her on sales calls, but would cancel "at the last minute". (Plaintiff's Depo. pp. 114-20)

50. Plaintiff admitted she had no factual support for her presumption that any cancellations were based on her internal complaints—she just "had feelings". (Plaintiff's Depo. p. 120)[2]

---

[2] It is undisputed that Kitzmiller told Plaintiff that Dave Pinette would assist her in the field. (Kitzmiller Depo. p.53; Ex. I to Memorandum of Law)  Yet, Plaintiff never solicited Pinette's assistance (Kitzmiller Depo p. 54), nor complained to Kitzmiller that she was having trouble getting support for her field calls. (Kitzmiller Depo. p. 104)

51.     Additionally, Plaintiff claims that ADP management failed to include her in weekly sales meetings because she did not have a "manager". (Plaintiff's Depo. p. 127)

52.     However, it is undisputed that Plaintiff was, in fact, reporting to Kitzmiller during this time and never complained about being excluded from such meetings, or about having trouble obtaining support for sales calls. (Plaintiff's Depo. pp. 127, 146; Kitzmiller Depo. pp. 59, 104-05)

53.     Plaintiff also alleges that her territory was reduced; (Plaintiff's Depo. p. 130) however, it is undisputed that this territory was reduced in July of 2001, well before Plaintiff complained. (Plaintiff's Depo. p. 130)

54.     Plaintiff further claims that commissions were unfairly split, but explained that the commissions were not "split" per se, but rather that another sales person was permitted into her territory to sell products. Additionally, one account was transferred into that other sales person's territory. (Plaintiff's Depo. pp. 120-121)

55.     However, Plaintiff confirmed that she could not recall, but for one product, whether these actions were taken before or after her internal complaint, and even with respect to the one product, she could not quantify what monetary amount, if any, was "split" between her and the other employee. (Plaintiff's Depo. pp. 120-126; see also Kitzmiller Depo. pp. 36-37, 41-42)

56.     It is similarly undisputed that Plaintiff was not disciplined in any manner, nor did she receive any counseling or warnings of any type after she complained. (Plaintiff's Depo. p. 112)

57.     Plaintiff conceded further that she never complained to HR about a perception of retaliation. (Carr Depo. pp. 98, 151-52; Plaintiff's Depo. p. 49)

58.     Finally, Plaintiff alleges that ADP's request that she provide certification of her need for leave, and its ultimate determination she had resigned when she failed to satisfy that requirement, was retaliatory in nature. (Plaintiff's Depo. p. 143)

59.     Plaintiff admitted this certification requirement was standard, and that it applied to all employees seeking leave. (Plaintiff's Depo. pp. 145-46) Plaintiff proffered no additional evidence that the requests for such certification in her case was motivated by ADP's desire to retaliate against her.

60.     With respect to her leave of absence, on or about February 14, Plaintiff failed to show up at work. She left a voicemail for her manager, Scott Martin, informing him that she was unable to come to work and that she would be faxing him a doctor's note substantiating her illness and need for leave. Nevertheless, Plaintiff neither provided this note, nor did she come to work. (Carr Depo. pp. 113-14, 154)

61.     Consequently, pursuant to the terms of ADP's standard leave policy, which Plaintiff admittedly received, (Ex. J to Memorandum of Law; Plaintiff's Depo. pp. 145-46, 157-58; Carr Depo. p. 114), on or about February 22, Carr wrote Plaintiff a letter reminding her that she needed to provide ADP with the proper medical certification. He gave Plaintiff approximately two weeks, until March 11, to comply with this requirement. (Ex. K to Memorandum of Law; Carr Depo. pp. 113-14)

62.     In this letter, as well as in all letters sent to employees on leave, Carr also stated that failure to submit the forms and the doctor's note by March 11 would be considered a voluntary resignation. (Ex. K to Memorandum of Law; Plaintiff's Depo. p. 8; Carr Depo. p. 113)

63.     Plaintiff did not directly respond, but on February 28, 2002, ADP received a doctor's note on her behalf, back-dated to February 14, stating simply that she could not work due to a "medical condition". (Plaintiff's Depo. p.18 and Ex. L to Memorandum of Law; Carr Depo. pp. 119-20)

64.     During her deposition, Plaintiff claimed that this "medical condition" consisted of "extreme stress, anxiety, and panic attacks." (Plaintiff's Depo. p. 25)

65.     However, Plaintiff still did not return the required leave of absence forms. (Plaintiff's Depo. pp. 8, 145-46)

66. Nevertheless, ADP did not terminate her employment; rather, on March 19, after not receiving forms for another nearly three weeks, Carr sent Plaintiff yet another letter reminding her that she needed to complete these forms, and providing an additional ten days, until March 29, to do so. He again reminded Plaintiff that, consistent with ADP's express policy, failure to meet this deadline would be considered a voluntary resignation. (Ex. M to Memorandum of Law)

67. Plaintiff never returned completed forms; never sent any additional doctor certification; never returned to work; and never notified ADP that she was not coming back to work. (Plaintiff's Depo. p. 21; Carr Depo. p. 144)

68. While ADP was under the impression she was unable to work, and continued her salary and benefits on that assumption, Plaintiff had already increased her hours to full time for another employer, HealthWorks. Plaintiff knew the salary and benefit continuation was effectuated expressly because ADP believed she was on an FMLA qualified leave, an impression she perpetuated when she left, and continued to perpetuate by having a doctor send a note on February 28 stating she was "unable to work". (Plaintiff's Depo. pp. 32, 180 and Ex. J and Ex. P to Memorandum of Law)

69. ADP's Leave of Absence Policy states that, "[a]s a condition of continued employment with ADP during a leave of absence, the associate granted a leave of absence agrees not to seek or obtain gainful employment elsewhere . . . if the associate does not meet these conditions, he/she will be considered to have voluntarily resigned his/her position. (Ex. J to Memorandum of Law)

70. Also at the same time, Plaintiff told her treating psychologist by early February of 2002 that she did not intend to ever return to ADP, even though she was still accepting salary and benefits from the Company. (Conter Depo. pp. 56-58)

71. ADP continued to pay Plaintiff her full salary and benefits through March 29, 2002. (Plaintiff's Depo. pp. 18, 43)

72.     After receiving no response from Plaintiff despite several opportunities to do so, ADP determined that Plaintiff had abandoned her job.  Accordingly, on April 3, 2002, Carr wrote Plaintiff a final letter, consistent with ADP's written job abandonment policy, informing her that she was deemed to have resigned effective March 29.  (Ex. O to Memorandum of Law)

73.     Plaintiff continued, and continues to this day, to be employed by HealthWorks.  She stopped being treated by any mental health professional in February of 2002, shortly after she began working for Healthworks on a full time basis.  (Plaintiff's Depo. pp. 27-29)

74.     After Plaintiff began her leave of absence, a second employee made an internal complaint against Gay.  On or about March 4, 2002, Gay's employment was terminated incident to the investigation of this second complaint (specifically, he was permitted to resign in lieu of forced termination).  (Carr Depo. pp. 107-08, 141-42; Martin Depo. p. 74)

75.     Plaintiff learned that Gay was terminated while she was out on leave, and before the Company deemed that she had resigned.  (Plaintiff's Depo. p. 96)

76.     Based on these undisputed facts, the following has been established:

(a)  even taking Plaintiff's allegations as true, she has failed to proffer sufficient evidence from which a fair-minded juror could conclude that the acts of which Plaintiff complains were gender-based, or otherwise sufficiently severe or pervasive to give rise to an actionable hostile environment claim;

(b)  in any event, once ADP learned of the alleged misbehavior, it immediately conducted an investigation and took prompt, remedial action by advising Gay's manager, changing reporting responsibility from Gay to Kitzmiller almost immediately, and verbally counseling Gay about the alleged conduct;

(c) Plaintiff was not subjected to tangible action; she can point to no evidence of a significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits;

(d) furthermore, ADP took preventive measures to prevent harassment, immediately investigated Plaintiff's complaints, and took appropriate, corrective action. First, ADP undisputedly maintained an anti-harassment and discrimination policy and internal complaint procedure. (Dank Depo. pp. 93-94) Plaintiff demonstrated her awareness of that procedure by utilizing it. (Ex. A ¶¶ 9, 11, 13, 14, 15);

(e) ADP then addressed the behavior with Gay and his superior, changed Plaintiff's reporting responsibility almost immediately, and never received any additional complaints from Plaintiff;

(f) yet, Plaintiff failed to take advantage of the remedial measures by ADP. Indeed, in February of 2002, Plaintiff simply just stopped coming to work, claiming that the stress and anxiety from the workplace prevented her from working, even though by this time Plaintiff had stopped reporting to Gay and, by her own admission, had little or no interaction with him. (Plaintiff's Depo. pp. 108-10, 129, 133) Furthermore, Plaintiff never returned from her medical leave despite the fact that, while out on leave, Gay had been discharged. (Carr Depo. pp. 109-08, 141-42; Martin Depo. p. 74);

(g) also, even though Plaintiff was ostensibly out on a stress-related disability leave and unable to work for ADP, she somehow was able to work full time at HealthWorks, a health club, during this same time period. (Plaintiff's Depo. pp. 21, 180, 183);

(h) in view of ADP's preventive measures, its prompt remedial action, and Plaintiff's failure to take advantage of such action, liability for sexual harassment cannot, as a matter of law, be imputed to ADP, even if an actionable claim for hostile environment sexual harassment can be maintained;

(i) with respect to her retaliation claims, Plaintiff fails to establish that she engaged in protected activity; that she was subjected to adverse action; or that there was any connection between the conclusion of job abandonment and the proclaimed protected activity;

(j) specifically, Plaintiff here cannot sustain her burden of proving that, as opposed to her subjective, unreasonable conclusions, the conduct of which she complained actually violated Title VII/comparable state law, or, in the alternative, that a reasonable person, in good faith, could believe the conduct of which she complained constituted actionable sexual harassment;

(k) furthermore, no reasonable person could view the events of which Plaintiff complains as being materially adverse. Plaintiff herself never alleges that she suffered any economic harm as a result of the so-called retaliation, nor does she allege demotion, probation, or loss of status, job security, earning potential, salary, benefits, or seniority. By contrast, Plaintiff admits that after she complained, she was never counseled, never warned, never demoted, and never disciplined in any manner. (Plaintiff's Depo. p. 112);

(l) with respect to Plaintiff's claims that management failed to provide support for her and that she was not permitted to offer product promotions to potential customers, she has provided no evidence whatsoever that these so-called changes caused her any direct economic harm. In particular, she does not allege that her job responsibilities were diminished in any manner or that she lost any accounts or any opportunities for advancement as a result of these changes. Plaintiff's subjective feelings of unhappiness or dissatisfaction with these "changes", even if true, are not enough to support a finding of adverse action;

(m) finally, Plaintiff's own testimony belies her allegation that ADP's request for medical information was in retaliation for her complaints. Indeed, Plaintiff admits that it was standard procedure for ADP to require medical certification from employees who were out on leave. (Plaintiff's Depo. pp. 145-46) In any event, requiring an employee to provide a doctor's certification while she is out on a medical leave does not constitute "adverse action";

(n) as to the third requirement imposed for the prima facie case, Plaintiff again fails to sustain her burden. First, Plaintiff cannot demonstrate that any of her peers who purportedly "ostracized" her knew of her complaints about Gay. (Plaintiff's Depo. pp. 85-88);

(o)  she also cannot prove that Gay even knew she made complaints about him which could reasonably be construed as legally protected—indeed, defense witnesses revealed that Plaintiff's claim of the touching of her breast was not even mentioned to Gay by his superior, Kitzmiller. (Dank Depo. pp. 38-9; Kitzmiller Depo. p. 8) Gay was told that all, unspecified touching was prohibited, as well as his use of profanity.  (Kitzmiller Depo. pp. 4-5; Gay Depo. p. 53; Carr Depo. pp. 65-66)  Moreover, Gay no longer supervised Plaintiff after December 11, and thus, could not have retaliated against her;

(p)  moreover, here as well, Plaintiff cannot establish that the requests for medical information, and the ultimate conclusion of job abandonment when she did not fulfill those requests, were attributable to her complaints about Gay.  The Company had every right to conclude that her failure to comply with clearly articulated and repeated certification requirements, coupled with her failure to even ask to return to work, constituted job abandonment.  Plaintiff's own testimony underscores the lack of merit to her assertions on this point. (Plaintiff's Depo. pp. 145-146);

(q)  in sum, proof of the requisite causal connection between the alleged adverse actions and Plaintiff's claimed protected activity is absent.  In the alternative, the record in this case is equally void of any indirect evidence of disparate treatment that similarly situated employees who engaged in similar conduct were treated in a dissimilar manner than Plaintiff;

(r)  assuming that Plaintiff could establish a prima facie case of retaliation, ADP has proffered a legitimate, non-discriminatory reason for determining that Plaintiff had abandoned her job, an act akin to resignation;

(s) Plaintiff cannot prove pretext in connection with this articulated reason.  ADP has demonstrated that its decision to deem Plaintiff to have resigned was based on a legitimate, non-retaliatory reason.  In turn, for those same reasons set forth above, it is clear that Plaintiff cannot proffer sufficient evidence to contradict this reason.  Rather, Plaintiff proffers only her subjective

unsubstantiated and unsupportable conclusion that ADP was motivated by a desire to retaliate against her, a conclusion insufficient to sustain her burden at this stage and thereby defeat ADP's Motion;

(t) the record is clear that Plaintiff voluntarily abandoned her employment, and even treating Plaintiff's complaints cumulatively, Plaintiff has not proffered sufficient evidence to establish that ADP intentionally created an intolerable working environment or that a reasonable person in her position would have felt compelled to resign. Specifically, any behavior that arguably might have rendered Plaintiff's work environment intolerable stopped as of December 11. Nevertheless, Plaintiff went on leave, never returned to work, and, at the same time, failed to adhere to the requirements of ADP's Leave of Absence Policy. Plaintiff was already working full-time elsewhere when ADP deemed her to have resigned. (Plaintiff's Depo. p. 180 and Ex. P to Memorandum of Law).

77.     In sum, summary judgment should enter as to the Complaint in its entirety.

### *By way of alternative relief:*

78.     Based on her conduct as outlined in the Defendant's submissions, Plaintiff is ineligible to demand front-pay at a trial of this action, and further, her potential back pay recovery is limited to the period between her discharge and the date that ADP discovered that she was working

full-time at another company; i.e., between March 29, 2002 and June 4, 2003; under the doctrine of after-acquired evidence.

        **THE DEFENDANT,**
        **ADP, INC.**


**BY**:_____
    Mary A. Gambardella, Esq.
    Federal Bar No. ct05386
    **EPSTEIN BECKER & GREEN, P.C.**
    One Landmark Square, Suite 1800
    Stamford, CT  06901-2681
    (203) 348-3737

       - and -

    Steven J. Younes, Esq.
    Federal Bar No. ct12408
    **EPSTEIN BECKER & GREEN, P.C.**
    One Landmark Square, Suite 1800
    Stamford, CT  06901-2681
    (203) 348-3737

## CERTIFICATION

The undersigned hereby certifies that a copy of the foregoing Statement of Undisputed Facts was sent via first class mail, postage prepaid, this 4th day of June, 2004 to counsel of record for the plaintiff as follows:

> James H. Howard, Esq.
> Phelon, FitzGerald & Wood, P.C.
> 773 Main Street
> Manchester, CT  06040

_____
Mary A. Gambardella