# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ELIZABETH LUPACCHINO** | : | **CIVIL ACTION NO:** |
| **Plaintiff** | : | **3:02 CV 2281 (MRK)** |
| | : | |
| **vs.** | : | |
| | : | |
| **ADP, INC. a/k/a AUTOMATIC** | : | |
| **DATA PROCESSING, INC.** | : | |
| **Defendant** | : | **JUNE 25, 2004** |

# MEMORANDUM IN SUPPORT OF
# PLAINTIFF'S OBJECTION TO
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.** **Introduction:**

In November 2001 the defendant ADP hired and unleashed an out-of-control supervisor upon its female work force in Windsor, Connecticut. Bill Gay was hired by ADP to supervise a team of five people who sold payroll preparation services. The team consisted of three women and two men. A jury will be able to conclude that within the first four months of Gay's employment he sexually harassed all three women on the team (none of the men), including the plaintiff, Elizabeth Lupacchino. He was fired by ADP for his conduct.

**ORAL ARGUMENT REQUESTED**

The plaintiff, Elizabeth Lupacchino, had multiple male managers at ADP before Gay was hired, and never had any problems with any of them. Gay sexually harassed her within weeks of his hiring and she immediately complained through the appropriate channels. Gay's boss intervened, undercut and minimized the investigation, and (according to Gay) did not discipline Gay in any fashion for his actions. As further set forth herein the plaintiff's working conditions were thereafter poisoned; her career spiraled downward; she was retaliated against; she observed and learned that other women were also being sexually harassed; and finally, when she filed a complaint with CHRO in February 2002, ADP responded by terminating her salary and illegally demanding a blanket medical authorization as a condition of her continued employment. Within ten days thereafter ADP terminated Gay after its investigation of other women's charges revealed that he had acted inappropriately toward the women he supervised, including the plaintiff. Title VII and the Connecticut Fair Employment Practices Act demand that a jury hear this case.

## II.    <u>Summary Judgment Standard</u>:

Summary judgment should only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); <u>Anderson v. Liberty</u>

Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 107 (2d Cir. 1998). After the moving party meets this burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(3); accord Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994); Wilburn v. Fleet Financial Group, Inc., 170 F. Supp. 2d 219, 226 (D. Conn. 2001).

Defendant ADP applies a standard of review which could only be met by a complete confession from a corporate defendant. Facts, and inferences therefrom are to be viewed must favorably to the plaintiff's claim. ADP ignores the role of inferences, which are, of course, critical in any case in which the corporate defendant has not made a full written confession of its intent to sexually harass its female employees and maintain a hostile work environment.

**III.  Hostile Environment Claims:**

The First and Fourth Counts of the plaintiff's Complaint state claims against ADP for acts against the plaintiff individually <u>and</u> acts against others which subjected her to a hostile work environment. C.G.S.§46a-60; 42 U.S.C. §2000 <u>et</u>. <u>seq</u>.

Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). To survive a motion for summary judgment, a plaintiff claiming he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." <u>Richardson v. New York State Dep't of Corr. Serv.</u>, 180 F.3d 426, 436 (2d Cir. 1999).

Elizabeth Lupacchino's workplace was permeated with severe and pervasive discriminatory intimidation. Even before Bill Gay arrived at ADP in the fall of 2001 a manager at ADP had engaged in a blatantly harassing act of a subordinate. (Ex. 7). Jill Kehl, supervised by Ken Kitzmiller, posted a photograph of her subordinate, Dave

Constant, in a public place at ADP which included the age-old slogan "if you are interested in a good time call 860-687-7949" Despite this conduct by a manager, in a public area at ADP, no sexual harassment training was initiated nor was any discipline imposed. It was this environment that Bill Gay entered at ADP.

Kitzmiller hired Bill Gay, who had little experience supervising women, yet was provided no sexual harassment training by ADP. Gay does not recall receiving ADP's written harassment policy, stating only that upon hiring he got a stack of documents four inches thick. (Ex. 3, Depo. B.Gay, p.111). Gay immediately launched into a harassment frenzy, starting with the plaintiff, Elizabeth Lupacchino, but eventually impacting all three women on his team and at least three other female employees of ADP in Windsor, Connecticut.

Gay grabbed Elizabeth Lupacchino's arm and intentionally touched her breast; she immediately complained to Human Resources; he thereafter grabbed the lapels of her coat with both his hands and shook her until she broke free; he repeatedly used the words "fuck" and "fucking" even after Elizabeth Lupacchino told him those words bothered her and she complained to Human Resources. (Ex. 2, E.Lupacchino's CHRO Aff.).

As a result of Gay's behavior Lupacchino was distraught and had to take prescription tranquilizers (Xanex). She took Xanex from December 2001 until March

2002 when she was no longer working at ADP. She was forced to visit her family physician on multiple occasions. Her family physician reported in January 2002 that her "emotional distress is quite evident." (Ex. 22). She was referred to a psychologist and visited her psychologist seven times from January through March 2002. Her psychologist diagnosed her and treated her for Generalized Anxiety; Adjustment Disorder with Depressed Mood. (Ex. 22).

Lupacchino was so convinced that Gay could not control himself that she was afraid to travel in the same car with him to sales calls. (Ex. 2, E.Lupacchino's CHRO Aff.).

Elizabeth Lupacchino worked at a work-station close to Bill Gay's office and observed his behavior with other women in the office. She saw him grab Maggie Tibideau, put her in a bear hug and spin her off her feet (Ex. 4, p.48); she saw him approach Kim Roscoe and attempt to do the same thing. (Ex. 4, pp.46-48). She saw him massage the shoulders of a female employee, Diane Grzelak, in front of numerous managers at a holiday party. She learned from another woman that Bill Gay had pulled a female subordinate, Jaime Hasson, onto his lap and pulled the top of her skirt down to observe a tattoo. She learned that Bill Gay was making sexual comments about the type of women and body types he liked; that he said "Jaime has a very nice body…"; that he was making sexual advances to Kristen Flaherty; that he thought Amy Leon's

"thighs and ass" were "thick and juicy" and he "likes a thick woman with big legs!" (Ex. 10).

Lupacchino learned that Gay discussed the size of his infant son's penis with Flaherty. (Ex. 10). She also learned that other women believed Gay repeatedly stared at the breasts and buttocks of female workers. (Ex. 10). When a Power Point presentation did not work at a training meeting for managers, Gay stated "that's funny it was working when the porn was on." (Ex. 10).

When Kristen Flaherty filed a CHRO Complaint against ADP, the company defended itself, in part, by asserting that Flaherty was a "willing participant in much of the inappropriate behavior about which she now complains." (Ex. 13). ADP states now that "virtually everyone" at sales level and management used profanity and that profanity was "rampant." (Def.'s Memo. in Support of Motion for Summary Judgment, p.12). The defendant does not claim that Lupacchino ever participated in such behavior and acknowledges that she complained about Gay's use of profanity. After Lupacchino complained the use of such language was an obvious affront to the plaintiff and intended to offend her.

ADP's contention that Lupacchino "admitted" that Gay's conduct was not sexual is inaccurate. Lupacchino was asked at her deposition "Q. Was it sexual, Ms. Lupacchino? Was he asking you for sex? A. No." (Ex. 4, p.70). The plaintiff was not asked if she

believed Gay acted as he did because she was a women; she was asked if she believed Gay was asking her for sex. Her answer can not be construed as an admission of a lack of gender bias. Obviously Lupacchino believes her gender was the reason she was targeted by Gay; she filed a CHRO Complaint and this lawsuit.

Bill Gay was an inappropriately busy man during his four months of employment at ADP. The plaintiff has cited evidence which will permit the jury to conclude that Bill Gay acted in a sexually inappropriate way toward seven women at ADP; none were his superiors, and there was never any allegation by any man that Gay acted inappropriately toward him. Subordinate women were the common denominator, which permits the jury to conclude that Gay's actions were based upon gender.

ADP's own actions and conclusions support the plaintiff's contention that her workplace harassment was severe and pervasive. ADP terminated Bill Gay's employment in part because of Elizabeth Lupacchino's complaint of sexual harassment. (Ex. 8, Depo. D.Dank, p.49). It is reasonable to conclude that ADP believed Gay's actions to be severe and pervasive, and not the harmless isolated instances it now suggests. The investigation(s) by ADP of the plaintiff's complaints to Human Resources substantiated that B. Gay had acted inappropriately toward Elizabeth Lupacchino. (Ex. 9, Depo. M. Carr, pp.44-45, 49, 52). ADP's investigation of Flaherty's complaint (made approximately two months after Elizabeth Lupacchino's) concluded that Gay had also

acted inappropriately toward Flaherty. (Ex. 13, ADP's CHRO response). ADP's investigation of Flaherty's complaint led ADP to believe that Gay had also acted inappropriately to the third female member of the sales team, Jaime Hasson. (Ex. 9, Depo. M.Carr, pp.16-18; Ex. 13, ADP's CHRO response).

ADP argues two contradictory points; that the work environment was pristine; but if it was not pristine it was so pervasively bad and profane that the bad behavior could not have related to sex. The defendant's contradictory positions demonstrate an issue of fact to be tried.

ADP's termination of Bill Gay belies its current claim that the sexual harassment doled out by Gay was not severe or pervasive. Gay's conduct got him fired (belatedly); generated two CHRO Complaints; forced the plaintiff onto prescription tranquilizers; forced the plaintiff into psychological counseling (Ex. 22); and forced the plaintiff to miss at least three separate weeks of work. From both an objective and subjective point of view the workplace was permeated with severe and pervasive discrimination.

A.    **Tangible Employment Action**:

The jury will be presented with facts from which it can conclude that ADP is vicariously liable for Bill Gay's actions.

These are two different situations in which the employer and misbehaving employee (Gay) have "something more than the employment relation" sufficient to

give rise to vicarious liability. <u>Burlington Indus., Inc. v. Ellerth</u>, 524, U.S. 742, 761-763 (1998). One such class of cases is that in which, in the course of creating or maintaining a hostile work environment, "a supervisor takes a tangible employment action against the subordinate," <u>id</u>., because

> [w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation…. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

For these reasons [among others], tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment against a subordinate. <u>Id</u>. at 761-63; See also, <u>Jin v. Metrol Life Ins. Co.</u>, 310 F.3d 84, 92 (2d Cir. 2002) (quoting <u>Ellerth</u>, 524 U.S. at 761-62).

The Supreme Court therefore held that if behavior illegal under Title VII culminates in a supervisor's tangible employment action, the employer will, ipso facto, be vicariously liable for it. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Id.</u> at 761. The tangible employment action is "the

means by which the supervisor brings the official power of the enterprise to bear on subordinates." Id. at 762. It is the use of the economic power of the employer exercised by the employee to whom the power has been delegated that renders the employer liable. See Id. And it seems unlikely that an employment action with economic dimensions taken by one employee with respect to another would entirely escape the knowledge of the employer's managers. Id.

Tangible adverse actions were taken against Elizabeth Lupacchino as a result of her refusal to acquiesce to Bill Gay's behavior. Immediately after Elizabeth Lupacchino complained to Human Resources about Bill Gay he resolved a commission dispute between Lupacchino and Flaherty in favor of Flaherty, since at that time she was a team player. (Ex. 11, D.Danks "investigation" notes).[1] She was transferred off of a sales team in Windsor, Connecticut and was thereafter purportedly supervised by Ken Kitzmiller, an off-site manager who was located in Stratford, Connecticut. ADP turned Lupacchino into a one woman team. She received none of the customary sales support provided to employees in her position. (Ex. 19, E.Lupacchino's Aff.). Her requests for the usual support from managers and sales team members went unheeded. Id. Bill Gay sent another salesperson into Lupacchino's "exclusive" territory to sell an ADP promotional

---

[1] D. Dank's notes clearly state that Elizabeth Lupacchino complained to Dank about "retaliation" in connection with the commission split. ADP does not even contend that Dank or anyone else investigated the charge of retaliation. (Ex. 11, p.2).

product that only Lupacchino should have been allowed to sell in that territory. (Ex. 4, Depo. E.Lupacchino, pp.124-125). Lupacchino was never included in any sales team meetings and was therefore never informed of product promotions she was entitled to offer to her customers. (Ex. 4, Depo. E.Lupacchino, pp.130-132). She was kept in the dark about a promotional price reduction and a new product (year-end W-2's) that she could have offered to her customers. (Ex. 4, Depo. E.Lupacchino, p.131). Lupacchino was at 70% of her sales quota when she first complained about Bill Gay. (Ex. 11, p.1). She fell to 32% 1½ months later. (Ex. 5). Every other team member was at least reaching 72% of their sales quota for the month of January 2002. (Ex. 5).

Lupacchino took multiple sick days when her anxiety about the Bill Gay situation overwhelmed her and ADP never offered to restore her sick days. When Lupacchino filed her CHRO Complaint, ADP demanded that she utilize her limited amount of FMLA leave time. (Ex. 1). ADP also demanded as a condition of her continued employment that Lupacchino provide ADP with a blanket medical authorization. ADP can hardly claim that such a request is standard, since it is contrary to both Federal and State labor regulations. (Ex. 15).

Lupacchino was at the mercy of her managers in regard to commission splits, sales support, and promotional offerings. There is strong evidence from which the

jury can conclude that her managers, Gay and Kitzmiller, took tangible employment actions against her. Summary judgment should, therefore, be denied.

**B.    Creation/Maintenance of Hostile Environment Without Tangible Employment Action:**

There is a second class of cases where the agency relationship between employer and supervisor facilitates the creation of a hostile work environment, Ellerth, 524 U.S. at 763; Faragher v. City of Boca Raton, 524 U.S. 775, 803 (1998). In cases in which "supervisor harassment… does not culminate in a tangible employment action," the employer may also be held vicariously liable for the supervisor's harassing behavior, but such liability is not established simply by establishing that the misbehaving employee is the victim's supervisor; the "risk of [imposing] automatic liability [in these situations] is high." Faragher, 524 U.S. at 804.

To fashion a rule of vicarious liability to apply to such cases, the Supreme Court looked not only to agency principles, but also to "other considerations" of Title VII, Ellerth,  524 U.S. at 764, especially "Title VII's… basic policies of encouraging forethought by employers and saving action by objecting employees," Id. at 764; Faragher, 524 U.S. at 807. The Supreme Court concluded that where a tangible employment action is not involved:

> [the] employer is [nonetheless] subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate… authority over the employee. [But in such cases] a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence…. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

The existence of tangible employment action thus affects whether the affirmative defense is available, but it does not affect the preliminary assessment of whether the employer may be held vicariously liable for the actions of a misbehaving employee. Vicarious liability, whether automatic or subject to the affirmative defense, depends on whether the power, economic or otherwise, of the harassing employee over the subordinate victim given by the employer to the harasser, enabled the harasser to create or maintain the hostile work environment.

"It is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates." Ellerth, 524 U.S. at 763. "[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation." Id. [T]he victim [,

moreover,] may well be reluctant to accept the risks of blowing the whistle on a superior." Faragher, 524 U.S. at 803.

ADP did not exercise reasonable care to prevent and correct sexually harassing behavior. Bill Gay received no sexual harassment training until the last two weeks of his employment at ADP. (Ex. 3, Depo. B.Gay, pp.111-112). Gay is not sure if he ever got a copy of the written harassment policy and if he did, it was in a stack of papers four inches high. Id. There is no evidence that ADP posted its sexual harassment policy. Whether an anti-harassment policy has been effectively published and disseminated among employees is an "important consideration" in determining whether a defendant has met its burden under the first prong of the analysis of the defendant's special defense. Faragher, 524 U.S. at 808-809. Summary judgment should be denied when there are factual disputes as to whether policy is disseminated and explained. Meng v. Ipanema Shoe Corp., 73 F. Supp. 2d 392, 401 (S.D.N.Y. 1999).

The defendants alleged investigation of the plaintiff's charges can be found by a jury to be a sham. Ken Kitzmiller told the Human Resources employee to whom Lupacchino complained to "leave his people alone." (Ex. 2, E.Lupacchino's CHRO Aff.). The investigator who thereafter handled the investigation (Debbie Dank) had never conducted a sexual harassment investigation before. (Ex. 8, Depo. D.Dank,

p.81). She never questioned Bill Gay. She never questioned anyone other than the plaintiff. (Ex. 8, Depo. D.Dank, p.81). EEOC guidelines suggest that Gay and other witnesses should have been questioned. (Ex. 18). Dank's notes state that Lupacchino reported to her that Gay "purposely brushed his hand on her chest," yet no one from ADP asked Gay if he touched Lupacchino's breasts. (Ex. 11).

ADP now claims Lupacchino's complaint was not one of sexual harassment. ADP previously represented to CHRO that her complaint was one of sexual harassment. (Ex. 13). Of course, ADP also has attempted to hide Dave Constant's CHRO Complaint and did not disclose it to CHRO, despite the fact that its disclosure was directly required in one of CHRO's inquiries to ADP. (Ex. 13).

ADP did not tell Bill Gay that retaliation against Lupacchino was prohibited, nor did he keep Lupacchino's complaint confidential. (Ex. 3, Depo. B.Gay, p.57). Gay demonstrated the ineffectiveness of ADP's harassment policy by declaring to his subordinates (after Lupacchino complained) that if they have a problem they are to go to him and not anyone else. (Ex. 10, para. 6(e)). The defendant inexplicably claims in its Memorandum that Lupacchino "cannot demonstrate that any of her peers who purportedly ostracized her knew of her complaints about Gay." (Def.'s Memo. In Support of Motion for Summary Judgment, p.28). ADP was served with a sworn CHRO affidavit by Kristen Flaherty in which she stated that Gay told her

about Lupacchino's complaint and said that Lupacchino wasn't to be believed. (Ex. 10, para. 6(e)).

EEOC guidelines state that the results of the investigation should be communicated to the involved individuals. (Ex. 18). Lupacchino was never told the results of the investigation. (Ex. 8, Depo. D.Dank, p.75; Ex. 2 E.Lupacchino's CHRO Aff.).

ADP claims it took corrective action but Bill Gay was not aware of any. He did not think he was disciplined in any way as a result of Lupacchino's complaint. (Ex. 3, Depo. B.Gay, pp.61, 65-66). The sole witness to Gay's alleged "warning" is Kitzmiller, Gay's boss. Kitzmiller's credibility is an issue for the jury. Kitzmiller yelled at the plaintiff to "stop playing mind games" as soon as he began to discuss her complaints with her. (Ex. 4, Depo. E.Lupacchino, p.94). The investigator, Dank, never made a note in her file about Gay being disciplined. After Dank left ADP on maternity leave, Mac Carr traveled to Massachusetts from New Jersey, picked up her file and added notes to it (two months after the fact) indicating that Gay had been warned by Kitzmiller. (Ex. 11; Ex. 8, Depo. D.Dank, pp.36-37). Carr added the notes after subsequent complaints were made against Gay in February 2002, and after the plaintiff faxed a copy of her CHRO Complaint to ADP. (Ex. 14; Ex. 13).

ADP will have a difficult time explaining to a jury how Gay could not know that he was disciplined or warned if he truly had been. It will also be difficult to explain why ADP waited until after the plaintiff's CHRO Complaint and other women complained about Gay to add notes to its file indicating that Gay had been disciplined. The jury can conclude that the plaintiff was not told of any discipline, and that Gay did not know of any discipline, because there had been no discipline. In other words, there was no corrective action taken. The jury will be able to infer that Carr's notes were added to the file to cover up the inadequacies of the Lupacchino investigation.

There are material questions of fact regarding whether ADP exercised reasonable care to prevent and correct sexually harassing behavior and, therefore, ADP's Motion for Summary Judgment should be denied.

## IV.    Retaliation Claim:

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." Gordon v. New York City Bd. Of Educ., 232 F.3d 111, 116 (2d Cir. 2000).

Lupacchino was clearly engaged in a "protected activity" since she followed ADP's complaint policy and registered her complaints with ADP's Human Resources department. She also filed a complaint with CHRO and made ADP aware of that "protected activity" on February 19, 2002. (Ex. 14).[2]

Lupacchino was subjected to adverse employment actions as a result of her protected activities. An adverse employment action is a materially adverse change in the employee's working conditions, such as termination, demotion or a reduction in wages or benefits. Wilburn v. Fleet Financial Group, 170 F. Supp. 2d 219, 236 (2001); citing Richardson v. New York State Dept. of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999). Less flagrant reprisals by employers may also be adverse. Id. Because there are no bright-line rules as to which employment actions meet the threshold for "adverse," courts must make this determination on a case-by-case basis. Id.

The events described herein unfolded at an extremely important time of the year in the payroll services business since many companies that are contemplating a change in payroll service choose to make the change effective early in the following year. (Ex. 19, E.Lupacchino's Aff.).

In late November 2001 Elizabeth Lupacchino first complained about Bill Gay's behavior. He was her boss and he immediately responded by resolving a commission

---

[2] In over 35 pages of Memorandum, the defendant failed to inform the Court that the plaintiff had filed a CHRO Complaint against it while Gay was still employed.

split in a way unfavorable to Lupacchino and in favor of a female "team player." (Ex. 2; Ex. 11). Gay's explanation to Lupacchino was simply that "he was the manager and he got to make the decisions." (Ex. 11, ADP's "investigation" notes). ADP knew that Lupacchino had been trying to make the sale for more than six months. Id.

Thereafter, Lupacchino received none of the customary sales support provided to employees in her position. (Ex. 19, E.Lupacchino's Aff.). Her requests for the usual support from the managers and sales team members went unheeded. (Ex. 19, E. Lupacchino's Aff.). Prior to her complaints about Gay her customary requests for support had been honored. (Ex. 19, E.Lupacchino's Aff.).

Rose Kitzmiller is Ken Kitzmiller's wife and worked for ADP in support of sales of certain products to CPA firms. (Ex. 4, Depo. E.Lupacchino, pp.115-116). After making her complaints about Bill Gay (and being told Ken Kitzmiller would be her new manager), Rose Kitzmiller was never available to help Elizabeth Lupacchino on her sales calls, even though Rose Kitzmiller continued to go on sales calls with other sales people. (Ex. 4, Depo. E.Lupacchino, p.116). Elizabeth Lupacchino had five sales calls in December and January to CPA firms for which she needed Rose Kitzmiller's help. Elizabeth Lupacchino had to cancel all five because Rose Kitzmiller made herself "unavailable." Id.

After Elizabeth Lupacchino complained about Bill Gay's sexual harassment, Bill Gay sent another salesperson into her "exclusive" territory to sell an ADP promotional

product that only Elizabeth Lupacchino should have been allowed to sell in that territory. (Ex. 4, Depo. E.Lupacchino, pp.124, 125). After Elizabeth Lupacchino complained about Bill Gay's sexual harassment of her she was never included in any sales team meetings, one purpose of which is to inform the salespeople of product promotions which boost their chances for sales. (Ex. 4, Depo. E.Lupacchino, pp.130-132). As a result of not being included in any sales team meetings Elizabeth Lupacchino only found out after-the-fact that a promotional price reduction could have been offered to her customers, and that a new product (year-end W-2's) was available. (Ex. 4, Depo. E.Lupacchino, p.131).

Lupacchino's sales figures were the worst on her "team" <u>after</u> she lost sales support at ADP. (Ex. 5). On January 24, 2002 her sales were 32% of quota. The next lowest member of her "team" was at 72% of quota. (Ex. 5). Of course, at that time Lupacchino was on a "team" in name only, and was receiving none of the job benefits of truly being on a team. In Debbie Dank's "investigation" notes (notes made in early December) she reported that "Liz is at 70% of plan." (Ex. 11).

On February 19, 2002 Elizabeth Lupacchino engaged in further protected activity by faxing a CHRO Complaint to ADP's headquarters and mailing the Complaint to CHRO. (Ex. 14). Unbeknownst to Elizabeth Lupacchino ADP was at that time investigating a complaint made by Kristen Flaherty against Bill Gay for sexual harassment. (Ex. 9,

Depo. M.Carr, pp.92-93). Mac Carr, from ADP's Human Resources Department had concluded in his investigation of Flaherty's complaint that Bill Gay had acted inappropriately toward Flaherty and toward another female member of the sales team, Jaime Hasson. (Ex. 13, ADP Response to CHRO). ADP's immediate response to Elizabeth Lupacchino's CHRO Complaint was to send a letter to her by Federal Express telling her that her salary would be "discontinued effective close of business today." (Ex. 1). ADP also told Elizabeth Lupacchino in response to her CHRO Complaint that her "failure to submit leave of absence forms will be considered a voluntary resignation." (Ex. 1). In addition, ADP's letter to Elizabeth Lupacchino illegally included a blanket medical authorization, which ADP represented she would have to sign to remain employed at ADP. (Ex. 1; Ex. 15, Dept. Labor Reg. §31-51qq-31).[3] The letter to Elizabeth Lupacchino was sent directly to Elizabeth Lupacchino even though ADP knew that at the time she was represented by counsel. (Ex. 14). The cutting off of salary and the demand for a blanket medical authorization created working conditions so intolerable that a reasonable person in Lupacchino's position would have felt compelled to resign. Lupacchino was, therefore, constructively discharged in retaliation for her protected activity. Constructive discharge is an adverse employment action giving rise to a Title VII retaliation claim.

---

[3] The employer is permitted to request that an employee obtain a medical certification from their doctor, however, "no additional information may be required. In all instances the information on the form must relate only to the serious health condition for which the current need for leave exists." (Ex. 15).

Wilburn v. Fleet, 170 F. Supp. 2d 219, 238 (2001); citing Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d. Cir. 2001).

The temporal proximity of the letter terminating her salary to the plaintiff's CHRO Complaint permits the Court to deny the defendant's Motion for Summary Judgment. Feingold v. New York, 366 F.3d 138, 156-157 (2nd Cir. 2004); citing Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2nd Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

Elizabeth Lupacchino never requested a leave of absence from ADP and, hence never took a leave of absence from ADP. (Ex. 4, Depo. E. Lupacchino, p.144; Ex. 19, E.Lupacchino's Aff.). When Elizabeth Lupacchino missed work due to Bill Gay's behavior she used sick days. (Ex. 4, Depo. E. Lupacchino, p.144; Ex. 19, E.Lupacchino's Aff.). FMLA leave is limited in duration. ADP's demand that Lupacchino utilize FMLA leave as a result of Bill Gay's actions would have forced her to irrevocably exhaust part of her annual FMLA entitlement. (Ex. 21, ADP's FMLA Policy, p.2).

In a similar case in this circuit the Trial Court found that the defendant's Motion for Summary Judgment should be denied. Parrish v. Sollecito, 249 F.Supp. 2d 342 (2003). In Parrish a female employee of a car dealership alleged that retaliatory adverse action had been taken against her after she complained that a manager had touched her thigh

on four occasions. The nature of the alleged adverse action was that the rest of the sales force would not deal with the plaintiff, and customers with whom the plaintiff would ordinarily have had contact (and generated commissions) were contacted directly by the rest of the sales force. The Trial Court concluded that "Insofar as such actions would work to materially diminish [the plaintiff's] job duties and lower her income and opportunities for advancement within the company, they would constitute sufficient adverse employment actions." Id. at 354; citing Ellerth, 524 U.S. at 761. The defendant lost its summary judgment motion, just as the defendant should do in this similar case. The employee in Parrish went on to win a jury verdict on her claim of retaliation. Parrish v. Sollecito, 258 F.Supp. 2d 264 (2003).

Lupacchino will also present to the jury evidence that the retaliation against her was part of a pattern of retaliation against those who engaged in protected activity. Dave Constant, a sales associate similarly situated to Elizabeth Lupacchino, complained to ADP's Human Resources Department on December 19, 2001 that Jill Kehl, his supervisor, was sexually harassing him. (Ex. 7). Mr. Constant's complaint to Human Resources was made approximately three weeks after Lupacchino's. Kehl's supervisor was Kitzmiller. One week later Kehl and Mac Carr (the Human Resources Director) asked Constant if he wanted to resign or be terminated. Constant responded that he wanted to speak to an attorney. Mac Carr responded by sending Constant a letter

terminating Constant's employment. (Ex. 7). Debbie Dank determined that Constant had, indeed, been sexually harassed. (Ex. 8, Depo. D.Dank, pp.86-87).

Less than two months later Elizabeth Lupacchino faxed her CHRO Complaint to ADP. Within three days Mac Carr sent her a letter (rather than her attorney) terminating her salary. (Ex. 1).

Within a two month period two salespeople made complaints about sexual harassment. The harassers were both supervised by Ken Kitzmiller. In each instance ADP believed that the alleged harasser had acted inappropriately. The complainants, Dave Constant and Elizabeth Lupacchino, were terminated (Constant) and had their salary cut off (Lupacchino).

There are genuine issues of fact which preclude summary judgment on the plaintiff's retaliation claims.

## V.  <u>Constructive Discharge Claim</u>:

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." <u>Widbee v. Garzarelli Food Specialites, Inc.</u>, 223 F.3d 62, 73 (2d Cir. 2000). To prevail on a claim of constructive discharge, a plaintiff must show

"deliberate action on the part of the employer…. [S]omething beyond mere negligence or ineffectiveness is required." <u>Id</u>. at 74.

The facts pertaining to the intolerable working conditions for the plaintiff have been set forth in detail in other sections of this Memorandum and in the Plaintiff's Local Rule 56(a)(2) Statement. Context is crucial to the analysis. Lupacchino had been repeatedly and offensively touched by Bill Gay; he used foul language even after the plaintiff complained; Ken Kitzmiller admonished her to "stop playing mind games;" she had no team; she lacked sales support; she witnessed and learned of continued offensive acts by Bill Gay toward other women; and she was at 32% of sales quota. The plaintiff faxed ADP her CHRO Complaint on February 19, 2002. ADP's only response, despite its knowledge at that time that Gay had treated other women inappropriately, was to send a letter to Lupacchino via Federal Express telling her that her salary was terminated and illegally asking her to provide ADP with a blanket medical authorization. (Ex. 1).

An objective person would believe their working conditions had degenerated to intolerable: there was no acknowledgement of a complaint; there was no assurance of investigation and/or remedial action; there was no salary; and there was a requirement for continued employment that the employer be authorized to fish around in its employee's medical records for nefarious purposes known only to the employer.

ADP intentionally created the intolerable work conditions. The letter ADP sent to Lupacchino was sent with knowledge of the CHRO Complaint and the other women's issues with Bill Gay. Such a letter served no legitimate purpose. Lupacchino had not asked to take a medical leave. ADP had no policy against paying employees while it investigated sexual harassment charges. The most reasonable explanation for ADP's action is that it sent Lupacchino the letter because it wanted to intimidate her and force her to quit. ADP knew it had liability for its actions (and inactions) in regard to Bill Gay and it, through Mac Carr, intentionally acted in a way that would make it clear to Lupacchino that she was not welcome to work at ADP.

The totality of the plaintiff's circumstances, combined with the letter terminating her salary permits a jury to conclude that the plaintiff's working conditions were intentionally made intolerable. There are, therefore, material issues of fact which preclude summary judgment on the plaintiff's claim of constructive discharge.

**VI.    The Plaintiff's Second Job Does Not Impair Her Claim Against ADP:**

ADP cites no cases supporting its claim that summary judgment is appropriate on issues relating to the measure of the plaintiff's damages. The plaintiff had a second job at a health club before and after Bill Gay arrived at ADP. When he literally made her sick she worked more hours at the health club. The plaintiff was never unable to work; she was unable to work with Bill Gay and ADP. (Ex. 19, E.Lupacchino's Aff.).

The defendant's repeated references to the plaintiff's second job appear to be a thinly veiled attempt to impugn the plaintiff's credibility on issues collateral to the defendant's summary judgment motion. Lupacchino mitigated her damages by increasing her hours at the health club as her career at ADP disintegrated. ADP <u>does</u> benefit from Lupacchino's second job; the job reduced her lost wage claim compared to what it would have been if she simply sat around doing nothing after her discharge from ADP. At this stage of the case, however, ADP's references to the plaintiff's second job are irrelevant to the factual and legal issues properly before the Court on a Motion for Summary Judgment.

## VII.  <u>Conclusion</u>:

For the reasons set forth herein, it is respectfully requested that the defendant's Motion for Summary Judgment be denied in its entirety.

PLAINTIFF,

By_____
    James H. Howard, For
    Phelon, FitzGerald & Wood, P.C.
    773 Main Street
    Manchester, CT  06040
    (860) 643-1136
    Facsimile (860) 643-5773
    Federal Bar No. ct07418

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing Memorandum in Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment was mailed this 25th day of June, 2004 to counsel for the defendant as follows:

Mary A. Gambardella, Esquire
Epstein, Becker & Green, P.C.
One Landmark Square, Suite 1800
Stamford, CT  06901-2681

_____
James H. Howard, For
Phelon, FitzGerald & Wood, P.C.
773 Main Street
Manchester, CT  06040
(860) 643-1136
Facsimile (860) 643-5773
Federal Bar No. ct07418