**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ELIZABETH LUPACCHINO | : | Civil Action No. 3:02CV2281 (MRK) |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| ADP, INC., | : | |
| Defendant. | : | JULY 19, 2004 |

## REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Defendant, ADP, Inc. ("ADP"), hereby respectfully submits its Reply to Plaintiff's Memorandum of Law in Opposition to ADP's Motion for Summary Judgment (hereinafter "Opposition Brief"). Initially, it must be emphasized that mischaracterizations of the record, and purported reliance on other events which did not even involve Plaintiff and which nevertheless were not even known to Plaintiff during her active employment with ADP, pervade the Opposition Brief. Moreover, the Opposition Brief is blatantly devoid of any judicial support for any of Plaintiff's theories, frankly indicative of the fact that summary judgment is warranted herein.

### I.    AN ACTIONABLE HOSTILE ENVIRONMENT DID NOT EXIST

In her argument as to why this Court should maintain her sexual harassment claim, Plaintiff asserts that complaints filed by two other employees, Dave Constant and Kristen Flaherty, should be considered in determining that a hostile environment existed at ADP. However, Plaintiff fails to advise the Court that she had no knowledge of either of these complaints during her active employment at ADP. Moreover, Ms. Flaherty's complaint was not even raised until after Plaintiff went out on the final leave from which she never returned. (Plaintiff's Depo. P. 51-52)[1] Additionally, the earlier complaint filed by Mr. Constant did not involve William Gay, Plaintiff's supervisor, and again, involved alleged incidents of distasteful remarks never witnessed, nor known

---

[1] Please note that excerpts from deposition transcripts which were not a part of the exhibits to Defendant's initial Memorandum of Law are attached hereto as Exhibit 1.

by, Plaintiff while actively working at ADP.  Plaintiff further ignores the undisputed fact that, as a result of Ms. Flaherty's subsequent complaint about Mr. Gay, his employment was terminated by ADP before the Company deemed her to have abandoned her job.  (Carr Depo., pp. 107-08, 141-42; Martin Depo. p. 74)

The courts dealing with this issue have unequivocally established that events unknown to a plaintiff while she was employed <u>cannot</u> be referenced to bolster a hostile environment claim.  <u>See Gibson, et al. v. Jacob Javits Convention Center of New York, et al</u>, 1998 U.S. Dist. LEXIS 3717, 95 Civ. 9728 (S.D.N.Y. Mar. 23, 1998) (plaintiff cannot premise her claim of hostile environment sexual harassment on conduct of which she was unaware, even assuming the allegations to be true); <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 108 (2d Cir. 1997) (incidents of hostile behavior only relevant where plaintiff had knowledge of them); <u>Layne v. ADT Security Services, et al.</u>, 1999 U.S. Dist. LEXIS 1166, 97 Civ. 4298 (JSM) (S.D.N.Y. Feb. 5, 1999) (summary judgment granted and plaintiff's harassment claim dismissed because there was no evidence that she was aware of the alleged hostile incidents she relied on to strengthen her claim, and no evidence that those incidents thereby affected her in any way); <u>Campbell v. Board of Regents</u>, 770 F.Supp. 1479, 1486 (D. Kan. 1991) (incidents about which plaintiff had no knowledge could not have contributed to the hostility she perceived in the department).  Consequently, it remains undisputed that Plaintiff's entire hostile environment claim remains premised upon isolated, infrequent episodes explored at length in the Defendant's initial Memorandum of Law.  (See pages 16-18, and hereinafter "MOL")  Moreover, Plaintiff fails to provide even a single citation to judicial precedent which supports her theory that such infrequent, isolated incidents can amount to an actionable Title VII or CFEPA claim, even taken in the aggregate.  Thus, it bears repeating that based on the uncontraverted judicial authority cited in Defendant's MOL, Plaintiff's allegations, even if true, were neither sufficiently severe nor pervasive so as to rise to the level of actionable hostile environment.  Quite frankly, the fact that Plaintiff feels compelled to focus on other alleged incidents about which she had no knowledge while employed by

ADP serves only to illustrate her own recognition that the allegations pertaining to her are insufficient as a matter of law.  (See also Defendant's MOL at pp. 10-18)  Accordingly, Defendant respectfully reiterates its request that Plaintiff's sexual harassment claims be dismissed.

Furthermore, as was recently enunciated by the United States Supreme Court since the filing of the MOL, in order to proceed with any of the other of her claims, Plaintiff must be able to sustain her initial burden as to the hostile environment claim; if she cannot, those claims too must automatically fail as a matter of law.  See Pennsylvania State Police v. Suders, 124 S.Ct. 2342, 72 U.S.L.W. 4493 (2004)[2] (creation of a hostile work environment is a necessary predicate to a hostile environment constructive discharge case).

## II.   PLAINTIFF CANNOT PROVE A TANGIBLE EMPLOYMENT ACTION

In the Opposition Brief, pages 9 through 18, Plaintiff attempts to negate Defendant's assertion regarding the absence of a tangible employment action, and thus, challenges the notion that the affirmative defense set forth in Faragher and Ellerth[3] should be applied.  In this effort, Plaintiff simply echoes her representations that: (a) she was involved in a commission dispute with one employee (interestingly, Ms. Flaherty, the subsequent complainant); (b) "sales support" was not thereafter provided; (c) another salesperson was permitted to sell in her "exclusive" territory; (d) she was not invited to sales meetings; (e) she was "kept in the dark" about promotions she could offer in her territory; and (f) in a new yet similarly unsubstantiated claim, that her "sick days" were not "restored".  In her futile and transparent attempt to establish some viable monetary loss, Plaintiff claims that as a result of the purported retaliatory conduct, her sales suffered.

While Defendant vehemently denies these allegations—notably, allegations wholly unsupported by the record—even if they are taken as true, Plaintiff still fails to establish that she

---

[2] Decided June 14, 2004.  In Suders, the Supreme Court primarily addressed whether a proven act of constructive discharge always obviates an employer's ability to establish the lack of a tangible employment action.  The Court held that even if a plaintiff establishes constructive discharge, the employer is not automatically precluded from still claiming the absence of tangible employment action.

[3] Burlington Indus. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

suffered any *direct* economic harm, such as discharge, demotion, or undesirable reassignment as a *direct* result of her complaint to management about Gay. Suders, 124 S.Ct. at 2351-2357 (a tangible employment action is a *significant* change in employment status, such as hiring, firing, failure to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits—emphasis added; citing Ellerth, 524 U.S. at 760). See also, Hill v. The Children's Village, 196 F.Supp.2d 389, 396-97 (S.D.N.Y. 2002)(same). Indeed, in Suders, 124 S.Ct. at 2355-2356, the Supreme Court elaborated that an "official act" of the supervisor is necessary for a constructive discharge to qualify as a tangible employment action. Citing Reed v. MBNA Marketing Systems, Inc., 333 F.3d 27, 33 (1st Cir. 2003), the Court clarified that even a supervisor's continued sexual advances were not the type of "official action" contemplated. In this regard, the Court explained that an official and direct exercise of company authority was needed to find tangible employment action where constructive discharge is alleged. Suders, 124 S.Ct. at 2356-2357.

Here, Plaintiff has not alleged one fact that could reasonably be construed as the requisite type of adverse action. She does not, because she cannot, allege demotion, probation, or loss of status, job security or benefits. On the contrary, Plaintiff admits that after she complained, she was never counseled, warned, demoted or disciplined. (Defendant's MOL at pp. 24-28; Plaintiff's depo. p. 112) She never provided any evidence, not to mention sufficient evidence, that she suffered direct economic harm from any purported "retaliatory" action. While, for the first time in the Opposition Brief, Plaintiff cites to declining sales results as constituting the "economic harm", she fails to explain how such poor sales results actually changed her status or compensation. Bluntly put, even if her sales numbers declined, her salary remained the same and any other purported economic harm was vague, unspecified and not sufficiently connected by any evidence with her internal complaint. (See Defendant's MOL at pp. 24-29--e.g., at her deposition, Plaintiff admitted changes in her sales territory *preceded* her complaint about Gay; that it was standard procedure to require medical certification for leaves of absence; that the commissions were not even necessarily "split"; or that any

other claimed action resulted in a quantifiable, identifiable detriment).[4]  Equally important, Plaintiff

herself conceded that many of these alleged "actions" occurred prior to her complaint, and in any

event, she could not recall with any certainty what happened before and what happened after that

complaint.  Additionally, her new allegation that her sick days were not restored is a misguided

attempt to create an issue of fact where none exists. See Anderson v. Liberty Lobby Co., 477 U.S.

242, 247-48 (1986).  To the contrary, it remains undisputed that Plaintiff was out on a leave of

absence and, in accordance with standard Company policy applied to all employees, she was asked to

certify her eligibility for that leave.

In short, Plaintiff's bold statement that there is "strong evidence" that tangible employment

actions were taken against her (Opposition at p. 12) is disingenuous at best, and not accompanied by

even one citation to the record.  It has been well settled that conclusory allegations, like those alleged

by Plaintiff here, are patently insufficient to defeat a summary judgment motion.  Quinn v. Syracuse

Model Neighborhood Corp., 613 F.2d 438, 445 (2d. Cir. 1980).  See also, Ott v. Perk Dev. Corp.,

846 F.Supp. 266, 271 (W.D.N.Y. 1994) (emphasis added--in order to defeat summary judgment, the

non-moving party must proffer sufficient evidence from the record which supports a reasonable

finding of discrimination); Goenaga v. March of Dimes Birth Defects Found, 51 F.3d 14, 18 (2d Cir.

1995) (opposing party may not rely upon unsupported allegations).  As Plaintiff merely proffers

unsupportable conclusions that "something" occurred because of her internal complaint, she thus

fails to sustain her burden of proof that a tangible employment action was taken.[5]

In essence, then, Plaintiff resorts to clouding the deficiencies of her claim by referring again

to complaints about which she had no knowledge whatsoever during her active employment to

challenge the quality of the investigation and the results thereof.  What Plaintiff cannot avoid is the

---

[4]  Equally noteworthy, contrary to her representation, issues with respect to Plaintiff's inadequate sales figures preceded her internal complaint about Gay. (Kitzmiller Depo., p. 50-51)

[5]  Also contrary to her suggestion now, there is no dispute that ADP's anti-harassment policy and complaint procedure was disseminated, including to Plaintiff; indeed, Plaintiff used the procedure to complain about Gay. (See Defendant's MOL at p. 20)

undisputed fact that, after lodging her complaint about Gay, her reporting structure was changed and she and Gay were immediately separated. Plaintiff leaves wholly unchallenged Defendant's cites to the record where she admitted her contact with him was virtually nonexistent after December 11, 2001. (Defendant's MOL at pp. 20-21) Consequently, self-serving CHRO affidavits of other former employees, describing alleged incidents wholly unknown to Plaintiff during her active employment, and notably not sworn to as part of the Opposition Brief, should be entirely discounted. <u>Gibson</u>, 1998 U.S. Dist. LEXIS 3717; <u>Campbell</u>, 770 F.Supp. at 1486; <u>Schwapp</u>, 118 F.3d at 108; <u>Layne</u>, 1999 U.S. Dist. LEXIS 1166.

### III.    PLAINTIFF'S RETALIATION CLAIM IS BASED ON MISCHARACTERIZATIONS OF THE RECORD

Mischaracterizations of the record likewise abound in support of Plaintiff's retaliation claim. Notably, here again, not one citation to an applicable judicial decision is provided to counter Defendant's argument that adverse action has not been established. (Defendant's MOL at pp. 24-28) Moreover, Plaintiff provides no judicial precedent to support her argument that ADP's insistence that she comply with the prerequisites of FMLA leave entitlement can be considered an "adverse action". (Defendant's MOL at pp. 27-28) By way of further example of the lack of logic to her argument, she claims she never "asked for leave", but cannot explain why she had a physician send a note certifying her as unable to work. (Defendant's MOL at 28 and Ex. L thereto)

Numerous times throughout her Opposition Brief, Plaintiff avers that ADP "demanded" a "blanket" medical authorization as a condition of continued employment. (Opposition at p. 2) This mischaracterization is yet another attempt by Plaintiff to obscure the record. The <u>actual</u> <u>record</u> unequivocally reveals that what ADP asked Plaintiff to provide was not a "blanket authorization," but rather, a standard doctor's certification of her illness and inability to work. Contrary to Plaintiff's shrill accusations, the purpose of this certification was obviously not to punish Plaintiff for complaining, but rather to ensure that Plaintiff continued to receive her salary and benefits pursuant

to ADP's standard policy.  Noteworthy, Plaintiff admitted that requiring such medical certification was part of the Company's standard procedure.  (Plaintiff's Depo. pp. 145-46)

Plaintiff relies on Parrish v. Sollecito, 249 F.Supp.2d 342 (2003), suggesting that this decision supports her retaliation claim.  However, the facts of Parrish are wholly distinguishable and, consequently, Plaintiff's reliance on the decision is completely misplaced.  Specifically, while the Parrish court did find that actions taken by defendants after plaintiff complained constituted adverse employment action, those actions are hardly "similar" to those presented in the case at bar.  To the contrary, the Parrish plaintiff alleged that her manager, among other things, affirmatively instructed his sales staff not to deal with her, and actively sought to deprive her of commissions by contacting customers *directly* to arrange for after-sales services ordinarily performed by plaintiff.  The Parrish court found that insofar as such actions would work to concretely, directly and materially diminish Parrish's job duties and lower her income and opportunities for advancement with the company, they constituted sufficient adverse employment actions.  249 F.Supp.2d at 354-355.  As evidenced by the record in this case, however, comparable facts have not been presented herein; the undisputed evidence establishes that, even assuming as true the actions Plaintiff alleges to be adverse, they did not result in any identifiable, proven change in her status, position, compensation, or responsibilities. (Defendant's MOL at pp. 24-29)[6]

Finally, as indicated above, Plaintiff's repeated reference to other complaints, and the unsupported speculative rendition of the results of those complaints, should not rescue her deficient retaliation claim.  Critical to note at this juncture, the depositions of Mr. Constant and Ms. Flaherty were never taken by Plaintiff, despite ample opportunity to do so.  Defendant respectfully submits

---

[6] Interestingly, the Parrish decision is actually supportive of Defendant's argument with respect to Plaintiff's sexual harassment claim.  Parrish argued that on four separate occasions her supervisor touched and rubbed her leg under her skirt, well above the knee and approaching her groin.  The court stated that such bodily contact cannot be equated in manner or degree with the isolated rubbing of an arm or shoulder, much like the isolated incidents presented herein.  Id. at 349.

that this Court should not now reward this failure by agreeing that questions of fact are created by the absence of that testimony and Plaintiff's rambling about what would have been established.

Nor should this Court be persuaded by Plaintiff's attempt to salvage her retaliation claim by focusing on the alleged temporal proximity of "the letter terminating her salary to [her] CHRO Complaint."[7]   Indeed, her reliance on temporal proximity serves only to underscore the lack of evidence and the justification for entry of summary judgment on her retaliation claims.   Contrary to the impression Plaintiff suggests to this Court, she was not deemed to have abandoned her job until March 28, 2002, after she failed to return the requisite forms or to return to work.   Defendant continued to pay Plaintiff her full salary and benefits through this date.   As the court held in Ghirardelli v. McAvey Sales & Service, Inc., 287 F.Supp.2d 379 (S.D.N.Y. 2003), the fact of temporal proximity in itself is insufficient to meet a plaintiff's burden at the *pretext* stage, even though deemed sufficient to satisfy her initial, prima facie burden.   However, when plaintiff was unable to proffer additional evidence that the employer's articulated reasons for her discharge—i.e., insufficient technical skills and her admission she had exaggerated her actual qualifications upon hire—were pretext, her claims were summarily dismissed.   The court emphasized that Ghirardelli's conclusory and unsupported conjecture that a connection did exist, simply because the events were close in time, was blatantly insufficient to sustain her burden.   See also, Spadola v. N.Y. City Transit Auth., 242 F.Supp.2d 284, 296 (S.D.N.Y. 2003); Gurry v. Merck & Co., 2003 U.S. Dist. LEXIS 6161, 01 Civ. 5659 (RLC) (S.D.N.Y. Apr. 14, 2003); Cruz v. Coach Stores, Inc., 202 F.3d 560 (2d Cir. 2000); Gonzalez v. Beth Isr. Med. Ctr., 262 F.Supp.2d 342 (S.D.N.Y. 2003); Hanna v. Infotech Contract Services, Inc. and Pfizer, Inc., 2003 U.S. Dist. LEXIS 7056, No. 3:01 CV 680 (SRU) (D. Conn. Apr. 23, 2003), aff'd, 2004 U.S. App. LEXIS 4692 (2d Cir. Mar. 11, 2004).

---

[7] Query whether temporal proximity even exists.  Plaintiff's internal complaint was made on November 26, 2001; she was deemed to have abandoned her employment at the end of March 2002.

## IV.    PLAINTIFF'S CONSTRUCTIVE DISCHARGE
## CLAIM IS LIKEWISE DEFICIENT

Plaintiff's argument that ADP constructively discharged her, based on the same factual underpinnings as her retaliation claim, revolves around her personal opinion rather than a viable challenge to the established legal standard for proving constructive discharge. (Defendant's MOL at pp. 32-33)  See also Suders, 124 S. Ct. at 2354 ("[a] hostile-environment constructive discharge claim entails something more [than proving the offending behavior was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.")(citations omitted).

Plaintiff seems to want to "have it both ways" with this argument; she wants to claim that ADP retaliated against her by requiring her certification for her medical absence, and then wrongfully terminated her employment when she did not comply.  Yet, at the same time, it appears that Plaintiff wants to claim constructive discharge which is only available to plaintiffs who *voluntarily resign* their employment.  See Pena v. Brattleboro Retreat, 702 F.2d 322 (2d Cir. 1983); Lombardo v. Oppenheimer, 701 F.Supp. 29, 31 (D. Conn. 1987); Cooper v. Wyetch Ayerst Lederle, 106 F.Supp.2d 479, 493 (S.D.N.Y. 2000).  In any event, it strains credulity to accept Plaintiff's claimed perception that any of the alleged actions by ADP and/or Gay, even if true, pass muster under the well-established standard for proving constructive discharge.  (Defendant's MOL at pp. 32-33)

## V.    THIS COURT CAN GRANT PARTIAL SUMMARY JUDGMENT

Plaintiff's lack of credible explanation for her behavior as referenced by Defendant in its moving papers (Defendant's MOL at p.34) is very telling.  Indeed, the new classification of her duplicitous behavior as "mitigation" is blatantly disingenuous; Plaintiff obviously wants to keep all

arguments alive, no matter how contradictory.  She was too ill to work at ADP, but not too ill to work full time hours elsewhere.  At the same time, her physician certification did not make that distinction to ADP.  She believed she had been fired when ADP required her to certify her illness, so she commenced "mitigation efforts", but continued to accept full salary and benefits from ADP after her employment was "terminated".  Critically important, she **does not dispute that ADP, had it learned of her full time employment elsewhere, would have, and could have, ceased paying her continued salary and benefits and definitively terminated her employment**.  In short, Plaintiff has provided no contrary judicial precedent for Defendant's assertion that such after-acquired evidence can form the basis for partial summary judgment, tolling Defendant's liability for claimed lost pay as of June 4, 2003.

## CONCLUSION

For the foregoing reasons, along with those reasons set forth in Defendant's initial Memorandum of Law in Support of its Motion for Summary Judgment, it is respectfully requested the Summary Judgment be granted as to the Complaint in its entirety.

THE DEFENDANT,
ADP, INC.

By: _____
    Mary A. Gambardella
    Federal Bar No. ct05386
    Epstein Becker & Green, P.C.
    One Landmark Square, Suite 1800
    Stamford, CT  06901-2681
    (203) 348-3737

— and —

Steven J. Younes
Federal Bar No. ct12408
Epstein Becker & Green, P.C.
One Landmark Square, Suite 1800
Stamford, CT  06901-2681
(203) 348-3737

## CERTIFICATION

The undersigned hereby certifies that a copy of the foregoing Reply to Plaintiff's Opposition to

Defendant's Motion for Summary Judgment was mailed via regular mail, postage prepaid, to all counsel

of record on the 19th day of July, 2004 as follows.

> James H. Howard, Esq.
> Phelon, FitzGerald & Wood, P.C.
> 773 Main Street
> Manchester, CT  06040
> *Counsel for the Plaintiff*

_____
Mary A. Gambardella

# EXHIBIT 1

xxx

LUPACCHINO v ADP, INC.

June 4, 2003                                    Elizabeth Lupacchino

Page 1

1              UNITED STATES DISTRICT COURT

                  DISTRICT OF CONNECTICUT

2

     CASE No. 3:02 CV 2281 (SRU)

3    - - - - - - - - - - - - - - - -X

4    ELIZABETH LUPACCHINO,

5                    Plaintiff,

6            vs.

7    ADP, INC. a/k/a AUTOMATIC

     DATA PROCESSING, INC.,

8

                     Defendant.

9    - - - - - - - - - - - - - - -X

10

11

12

13            D E P O S I T I O N

14        The deposition of ELIZABETH LUPACCHINO was taken

15   pursuant to Notice at the law offices of Epstein, Becker

16   & Green, One Landmark Square, Stamford, Connecticut,

17   before Viktoria V. Stockmal, License #00251, a Notary

18   Public in and for the State of Connecticut, on Wednesday,

19   June 4, 2003 at 10:35 a.m.

20

21

22

23

24

25

LUPACCHINO V ADT, INC

June 4, 2003                                        Elizabeth Lupacchino

Page 51

1   fall of '01.

2       A      Right.  So it would have been after

3   December.

4       Q      When did you hear about it?

5       A      I heard about it in February of '02.

6       Q      How did you hear about it?

7       A      A co-worker called me.

8       Q      Who?

9       A      Kristen.

10      Q      Flaherty?

11      A      Uh-huh.

12      Q      So she called you in February of '02 at some

13  point?

14      A      At some point in February we were talking.

15      Q      Were you on leave or were you still working

16  at the office?

17      A      I don't believe I was working.

18      Q      If you weren't working, Ms. Lupacchino, how

19  did that create -- hearing about that create a hostile

20  environment for you at work?

21      A      Because at that point I was still again

22  having these -- at that point when I heard about it, it

23  was before the February 22nd letter.

24      Q      But you weren't going to work when you got

25  this call and heard this story, right?

SANDERS, GALE & RUSSELL
(203) 624-4157

LUPACCHINO V ADP, INC.

June 4, 2003

Elizabeth Lupacchino

Page 52

```
1        A       Right.

2        Q       Tell me what other incidents of sexual

3   harassment or gender discrimination you've heard about?

4        A       Also with Kristen, she told me about some

5   things that Bill had said to her.

6        Q       Was this during the same phone call or a

7   different communication?

8        A       No, that was a different communication.

9        Q       When did Ms. Flaherty call you about the

10  things that Mr. Gay had said to her?

11       A       That was actually very, very coincidental

12  when I was at the doctor's and her doctor is in the same

13  building.

14       Q       Ms. Lupacchino, do you remember this much,

15  was it before or after the call in February '02, whenever

16  in February, where she told you about Jamie Hasson?

17       A       It was before that.

18       Q       All right.  Were you still reporting to work

19  at ADP, if you recall, when you ran into her in the

20  doctor's office?

21       A       Yes.

22       Q       Do you know whether or not she was reporting

23  to work at the time?

24       A       I don't know for sure.

25       Q       So you are in the doctor's office and you
```

SANDERS, GALE & RUSSELL
(203) 624-4157

COPY

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ELIZABETH LUPACCHINO,

        PLAINTIFF,

VS.                                    3:02 CV 2281 (MRK)

ADP, INC., a/k/a
AUTOMATIC DATA PROCESSING, INC.,

        DEFENDANT.

DEPOSITION OF KENNETH KITZMILLER

        Taken in accordance with the Connecticut
        Practice Book at Epstein, Becker & Green, P.C.,
        One Landmark Square, Suite 1800, Stamford,
        Connecticut, by Sabina Lohr, Registered
        Professional Reporter and Notary Public in and
        for the State of Connecticut, on Tuesday,
        October 14, 2003, at 11:10 a.m.

APPEARANCES:

        PHELON, FITZGERALD & WOOD, P.C.
        Attorney for the Plaintiff
        773 Main Street
        Manchester, Connecticut 06040
        (860) 643-1136
        BY:  JAMES H. HOWARD, ESQUIRE

        EPSTEIN, BECKER, & GREEN
        Attorney for the Defendant
        One Landmark Square
        Suite 1800
        Stamford, Connecticut 06901-2681
        (203) 348-3737
        BY:  MARY GAMBARDELLA, ESQUIRE
             STEVEN J. YOUNES, ESQUIRE

                    Sabina Lohr
            Registered Professional Reporter
        Niziankiewicz & Miller Reporting Services
    972 Tolland Street, East Hartford, Connecticut 06108
    Phone (860) 291-9191          Fax (860) 528-1972

1  performance?

2      A.   Yes.

3      Q.   Okay.  And at this particular point in time

4  when my client made her complaints, did you have any

5  knowledge that at any point in time during her ADP

6  career she had been on a performance warning?

7      A.   I don't recall.

8      Q.   At that particular point in time again when you

9  first heard of the complaint, what was your sense of

10  how my client was performing as an employee?

11      A.   She was under quota.

12      Q.   But what does that men in terms of how you felt

13  about her performance?  Was she one of the worst

14  employees?  Was she one of the best?  Do you have any

15  sense of that?

16              MS. GAMBARDELLA:  Object to form.

17          You can answer.

18      A.   She wasn't performing up to expectations.  As

19  far as how she ranked in the office, she wasn't one of

20  the superstars.

21      Q.   But she wasn't one of the worst either; right?

22              MS. GAMBARDELLA:   Object to form.

23      A.   I don't have the numbers with me now to

24  remember.  But I would never -- if I remember

25  correctly, I do believe her performance was in the

1    lower half of the office.

2        Q.   Okay.  And about that same point in time three

3    other people of comparable positions to my client got

4    laid off from the ADP office in Windsor; right?

5        A.   No.

6        Q.   You don't -- were there any layoffs in November

7    of 2001 from the ADP office in Windsor?

8        A.   Let me just clarify.  Not -- if --

9    terminations?

10       Q.   Right.

11       A.   Okay.  Like --

12               MS. GAMBARDELLA:   Well --

13       A.   Never laid off for job reduction or staff

14   reduction.  But there might have been some people that

15   were let go for performance.

16       Q.   That's what I'm getting at.

17       A.   Okay.

18       Q.   There were terminations in November 2001?

19       A.   I -- I don't recall specifics.  Yes, there

20   could have been.

21       Q.   But I take it, then, if you don't recall, that

22   those particular decisions about the terminations in

23   November 2001, those would not have been your

24   decisions?

25       A.   I would have had -- yes.  They would have been